**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**HARWYN INDUSTRIES CORPORATION et al., Defendants.**

No. 70 Civ. 2693.

United States District Court,
S. D. New York.
March 29, 1971.

Kevin Thomas Duffy, Regional Administrator, S.E.C., New York City, for plaintiff; William D. Moran, Donald N. Malawsky, Marvin G. Pickholz, and Ira Lee Sorkin, New York City, of counsel.

Segal & Hundley, New York City, for defendants Harwyn Industries Corp. and Harvey R. Siegel; Marvin B. Segal and Robert L. Beerman, New York City, of counsel.

Gartenberg, Ellenoff, Lehrer & Stein, New York City, for defendant Irving L. Gartenberg.

Feldshuh & Frank, New York City, for defendant Academic Development Corp.; Sidney Feldshuh, Richard Weinberger, Donald P. Miller, New York City, of counsel.

Weinstein & Levinson, New York City, for defendant Hyman Temkin; Samuel Weinstein, New York City, of counsel.

Steven B. Duke, New Haven, Conn., for defendants James W. Feeney, Xanadu Properties, Inc., Ramon N. D'Onofrio.

Royall, Koegel & Wells, New York City, for defendants JKM Industries, Inc. and J. Kevin Murphy; Norman S. Ostrow and James J. Maloney, New York City, of counsel.

Bittel, Langer, Blass & Corrigan, Miami, Fla., for defendant Motel Trailer Distributors, Inc.; Gerald J. Beyer, Miami, Fla., of counsel.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for defendant Stephen Kirshner; Reginald Leo Duff, New York City, of counsel.

Penn & Burns, New York City, for defendant Wayne Slockbower; Richard E. Burns, New York City, of counsel.

Stradley, Ronon, Stevens & Yound, Philadelphia, Pa., for defendants FSI, Inc. and Harold C. Yates; Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, of counsel.

MANSFIELD, District Judge.

In this action the Securities and Exchange Commission ("the Commission") seeks to plug up what some have treated as a loophole in the federal securities laws permitting a company, by "spinning-off" its subsidiary's shares to the parent's stockholders without registration, to convert the subsidiary into a public corporation whose unregistered shares would be actively traded on the market. The suit is brought under § 22(a) of the 1933 Securities Act, 15 U.S.C. § 77v(a), and § 27 of the 1934 Securities Exchange Act, 15 U.S.C. § 78aa. The Commission alleges violations of the registration requirement of § 5 of the 1933 Act, 15 U.S.C. § 77e, and of the antifraud provisions of both the above securities acts, § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) and § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.-10b-5. Preliminary injunctive relief is sought, Rule 65, F.R.Civ.P., § 20(b) of the 1933 Act, § 21(e) of the 1934 Act, against all 15 defendants on the basis of their participation in a series of transactions involving stock distributions by Harwyn Industries Corporation ("Harwyn") to its shareholders.

The scheme involved three coordinated steps: (1) the acquisition by the subsidiaries of assets of other corporations in exchange for issuance of controlling interests in the subsidiaries to those contributing such assets, (2) the "spin-off" distribution by the parent, Harwyn, to its stockholders of the unregistered

shares of its subsidiary owned by it, and (3) the development of an over-the-counter trading market in the unregistered shares thus spun-off. Although the motion for a preliminary injunction was made many months ago, we deferred decision because of the pendency of settlement discussions. No such settlement, however, was reached, despite several conferences in open court. Because there is little dispute over the basic facts on which the litigation is based, our decision relies on undisputed facts appearing from the affidavits and other voluminous papers submitted by the parties. SEC v. Frank, 388 F.2d 486, 490 (2d Cir. 1968).

Harwyn was incorporated in 1958 under the name Harwyn Publishing Corporation and engaged in the printing business. In 1965 it changed its name by substituting "Industries" for "Publishing." On June 22, 1961, a registration statement filed pursuant to the requirements of the 1933 Securities Act, Form S-1, became effective, covering a public offering of 131,000 shares of its common stock. The stock is traded over-the-counter, and Harwyn has approximately 600 public shareholders. Harwyn is not a public reporting company in that it is not required to file reports with the Commission. Harvey R. Siegel ("Siegel") is its President and Chairman of its Board of Directors. Irving L. Gartenberg ("Gartenberg"), an attorney, is, and has been since 1962, its Secretary, a member of its Board of Directors, and general counsel.

The actions of which the Commission complains involved four corporations which were wholly-owned subsidiaries of Harwyn as of November 1968—Cleopatra Cosmetics Corporation ("Cleopatra"), NTRR, Inc. ("NTRR"), Motel Trailer Distributors, Inc. ("Motel"), and Prospectus Press, Inc. ("Prospectus").

Cleopatra was incorporated on May 13, 1963, and was an active subsidiary of Harwyn in the business of distributing cosmetics. Counsel for Harwyn inquired of the Commission, both in New York and in Washington, regarding the need for registering a "spin-off" distribution of Cleopatra stock to the Harwyn shareholders, but there is no indication that any view on the question was offered by the Commission in reply. On November 21, 1968, the Board of Directors of Cleopatra authorized a distribution of 127,500 Cleopatra shares held by Harwyn to its shareholders, one share of Cleopatra being distributed for every four shares of Harwyn held as of December 6, 1968. The distribution was payable December 30, 1968, and was effected on that date. Seventy-five thousand five hundred shares were distributed to Harwyn insiders (presumably Siegel and Gartenberg), and the remaining 52,000 shares were distributed to the public shareholders of Harwyn. A notice as to the source of the distribution, required by N.Y. Business Corporation Law, McKinney's Consol.Laws, c. 4, § 510(c), was sent to the shareholders of Harwyn.

On November 7, 1968, well before the distribution had been authorized, an attorney in Gartenberg's office wrote to the National Quotation Bureau to arrange for trading in the shares of Cleopatra. The letter set forth basic but somewhat skimpy information concerning Cleopatra, i. e., its name, address, state of incorporation, number of shares issued, etc., and did not reveal anything about the business of the company. Beginning on January 6, 1969, Cleopatra stock was quoted on the over-the-counter listings, or "pink sheets," published by the National Quotation Bureau.

The Harwyn insiders who received Cleopatra shares were prevented by law from trading their Cleopatra shares without registering them pursuant to § 5 of the 1933 Securities Act. Stop transfer orders with respect to such shares were placed with Cleopatra's transfer agent, Bankers Trust Company.

On approximately January 13, 1969, negotiations were commenced concerning the possibility of an exchange of investment stock between Harwyn and certain individuals who were to become, after completion of the exchange, the principals of Cleopatra, the name of which was to be changed to Academic Development

Corporation ("Academic"). These individuals included Hyman Temkin ("Temkin"), who became President and Chairman of the Board of Academic, James W. Feeney ("Feeney"), who succeeded Temkin as President and a director of Academic, and Ramon D'Onofrio ("D'Onofrio"), who was to become Secretary-Treasurer and a director of Academic. It appears that D'Onofrio may have been the most active in conducting these negotiations. A 16-page agreement was signed on January 18, 1969, embodying the terms of the exchange. Cleopatra was to issue 872,500 new shares of common stock (amounting to 87% of the stock in Cleopatra after issuance) in exchange for stock in two publicly traded companies—49,000 shares of Educational Science Programs ("ESP") and 53,000 shares of Academic Systems and Management Corp. ("Systems"). Of the 872,500 Cleopatra shares, 254,000 were to go to Temkin, 254,000 to Feeney, and 253,500 to Xanadu Properties, Inc. ("Xanadu"), a corporation engaged primarily in holding securities. Xanadu's President, Muriel Barter, is D'Onofrio's wife. D'Onofrio acted as "attorney-in-fact" for Xanadu and all of the parties who participated in the above transaction. Sixty-nine thousand shares were paid to Hill, Thompson, Magid & Co., Inc. ("Hill, Thompson") as a finders fee. The remaining 42,000 Cleopatra shares were distributed among three associates of the D'Onofrio group.

The agreement, Art. 3(d), recognized that the shares of ESP and Systems obtained by Cleopatra were to be acquired for investment, and Cleopatra consented to their being legended with the statement that they were not registered under the 1933 Securities Act. The agreement further provided, Art. 4(c), that the Cleopatra shares newly issued in exchange for the ESP and Systems stock were acquired for investment and would be similarly legended. There is no evidence that the restriction implicit in the legending has been violated in any way. Temkin has, however, made certain transfers which are allegedly exempt.

Article 9 of the agreement provided that if Cleopatra were to register any stock for sale to the public, e. g., stock held by D'Onofrio and his group, the Harwyn insiders could register up to 40,-000 shares of their Cleopatra stock. After two years, Cleopatra agreed to file a registration statement covering the shares held by Harwyn insiders and those held by Hill, Thompson. In the event of any such registration, each selling shareholder was to pay his pro rata portion of the underwriting and registration costs.

Cleopatra was required to adopt a name other than Cleopatra pursuant to the agreement, Art. 8, Harwyn reserving to itself "all right, title and interest" in the name Cleopatra Cosmetics. As a result of the "spin-off" distribution to Harwyn shareholders, the letter from Gartenberg's office to the National Quotation Bureau, and the listing of Cleopatra shares on the pink sheets, described above, Cleopatra stock became publicly traded. Although the name "Cleopatra" was reserved by Harwyn, the advantages of being a public corporation remained with the "spun-off" company. On January 9, 1969, the price of Cleopatra was $3 bid per share. By February 28, 1969, the price had risen to $15½ bid per share, and on March 28, 1969, the price reached $22 bid per share. On June 30, 1970, the price of Cleopatra (then known as Academic) was $1 bid per share. Approximately five broker dealers made the market in Cleopatra stock.

In March 1969, Cleopatra changed its name to Academic. Since then it has been active in the field of education. The controlling persons have assertedly lent Academic amounts of money and have guaranteed as yet unpaid bank loans in substantial amounts.

We now turn to the second transaction involving the Harwyn subsidiary known as NTRR and J. Kevin Murphy ("Murphy"), which followed closely the pattern of the Cleopatra (Academic) arrangement. NTRR, the Harwyn subsidiary, was incorporated on October 16,

1962, as a sales agency for radio and television time. Until early 1969 Murphy was the sole stockholder and chief executive officer of two California corporations engaged in the business of general construction and leasing of construction machinery—J. K. Murphy Associates and M & S Equipment Company. He had operated these companies profitably for about three years, but in late 1968 he concluded that it would be advantageous to have public shareholders and an active trading market for his stock in order to expand the business of his companies. He was advised that a legitimate method of achieving this goal without the expense of registration with the Commission might be to acquire a controlling interest in an inactive corporation which had public stockholders.

In late 1968, through the assistance of a consultant, Alvin K. Sweitzer ("Sweitzer") of AKS Consultants, Murphy learned of NTRR. A meeting was arranged by Sweitzer at which Murphy, his California counsel, and Siegel were present. A deal was discussed whereby Murphy would transfer all the shares of his corporations to NTRR, receiving in exchange a controlling interest in NTRR. Beset by a lingering concern about the legality of the proposed transaction, Murphy then consulted New York counsel and was assured that, although the Commission was concerned that the "spin-off" device not be used by unscrupulous persons to defraud the public, no Commission release or prior litigation indicated that the proposed transaction would be unlawful.

On the basis of the foregoing legal advice, as well as the advice of other experienced businessmen, on February 12, 1969, Murphy entered into a 22-page agreement with Harwyn for the purchase of 650,000 shares of common stock to be issued by NTRR, for which NTRR was to receive all the stock in the two above-mentioned California corporations (J. K. Murphy Associates and M & S Equipment). In Art. 3.12 of the agreement, Murphy warranted that he was taking the NTRR stock for investment and not with a view to its distribution, and Art. 5.2(vi) set forth explicitly the legend which such stock was to bear. There is no evidence that Murphy has sold or otherwise transferred or encumbered any of his NTRR stock.

On February 29, 1969, as had been expressly covenanted in Art. 7.1 of the agreement, the Board of Directors of Harwyn authorized the "spin-off" distribution of Harwyn's 200,000 shares of NTRR to Harwyn shareholders of record as of March 14, 1969, payable April 7, 1969. The Harwyn shareholders were to receive one share NTRR for each four shares of Harwyn. The distribution was effected April 7, with Harwyn insiders receiving 125,000 shares and Harwyn public shareholders receiving 75,000 shares. Under the terms of the agreement, Art. 7.4, the Harwyn insiders (in this case, Siegel and one Garson Reiner) were required to give Murphy irrevocable proxies on their shares of NTRR for a period of two years and were prohibited from selling their shares during that period without the consent of NTRR. In Art. 8.2, NTRR agreed that, after two years had elapsed, it would file a registration statement with the Commission covering all shares held by any insider at the request of such insider. The expenses of such registration and of underwriting were to be shared pro rata by the insiders whose shares were being registered. Pursuant to Art. 8.1 of the agreement, NTRR changed its name to J.K.M. Industries, Inc. ("JKM") in May 1969. Under that same provision Harwyn retained all right, title and interest in the name NTRR.

A release was sent to Harwyn shareholders on March 7, 1969, informing them of the impending dividend and describing enough of the contract with Murphy to indicate that after the transaction closed on March 21, 1969, Murphy would become the controlling stockholder of NTRR. Another release, undated but apparently mailed out with the distribution of NTRR shares to Harwyn stockholders on or about April 7, paralleled the Cleopatra release in form

but stated that the distribution would not affect the stated capital, capital surplus, or earned surplus of Harwyn, as NTRR had no assets or liabilities.

NTRR (JKM) shares were listed on the pink sheets for March 18, 1969, more than two weeks before the distribution of NTRR (JKM) shares. NTRR (JKM) stock was quoted in the pink sheets by 10 broker dealers. The price of the stock was $7 bid per share on April 30, 1969, rising to $9 bid per share on May 30, 1969, then falling to $4 bid per share on November 21, 1969, and finally reaching $½ bid per share on June 30, 1970. Murphy thus succeeded in creating public (over-the-counter) trading in JKM stock without registration.

Turning to the third of these almost identical "spin-off" transactions, Motel, the Harwyn wholly-owned subsidiary involved in the third transaction, was incorporated on December 31, 1963. Motel was originally engaged in the distribution of motel trailers but never seems to have conducted any significant business. Group V, the outside group in this case, had been operating since 1968 as an unincorporated business by John N. Valianos ("Valianos"), Stephen Kirshner ("Kirshner"), and Wayne Slockbower ("Slockbower"). It engaged in market research and sales promotions. Group V found that most of the companies that it dealt with were public companies, as were most of its competitors. These public companies were able to give their employees stock options and other inducements to employment. Valianos, et al., considered making Group V a public corporation through the conventional process—i. e., by incorporating, filing a registration statement and making a public offering of Group V stock. This course was rejected because of the expense of registration and the fact that Group V did not need public funds.

In April 1969 Kirshner read an article in the March 29, 1969, issue of *Business Week* which outlined the "spin-off" technique for becoming a public corporation without the necessity of filing a registration statement. The article did in-

dicate the Commission's growing concern over the spin-off practice, but what Kirshner found more interesting were four paragraphs devoted to Harwyn's recent distributions of Cleopatra (Academic) and NTRR (JKM).

Kirshner met Siegel through mutual friends. Siegel referred Kirshner to Gartenberg. Presumably after some negotiation, and as Kirshner states in his affidavit after consultation with attorneys and accountants concerning the legality of the transaction, on June 13, 1969, Motel entered into a 21-page formal agreement with Valianos, Kirshner and Slockbower whereby these individuals received a total of 675,000 shares to be issued by Motel; in exchange, Motel received all the issued and outstanding stock of Group V, Inc., a New Jersey corporation which had been incorporated by Valianos and company at about the same time. Four days earlier on June 9, 1969, possibly while informal negotiations for the Motel transaction were in progress, the Board of Directors of Harwyn had authorized the distribution of ·one share of its Motel stock for every three shares of Harwyn stock owned by Harwyn shareholders of record on July 1, 1969, payable on July 31, 1969.

The June 13 agreement, Art. 3.11, provided that the shares of Motel stock to be issued and delivered to the Group V principals were being acquired for investment and not for distribution. The Motel stock issued to insiders was also to bear a legend, Art. 5.2(vi), stating that the shares were not registered pursuant to the 1933 Securities Act and could not be sold, transferred, pledged or hypothecated without such registration. It does not appear that any of this stock has been sold or transferred in violation of the legend; indeed, on July 10, 1969, Kirshner purchased 500 additional shares of Motel on the over-the-counter market at $7 per share. Harwyn agreed to declare and distribute the Motel stock dividend to its shareholders at a one-for-three ratio, Art. 7.1. A change of name provision was included, Art. 8.1, and Motel's name has now been

changed to Group V. Harwyn retained all right, title and interest in the words "Motel Trailer." Finally, Siegel, Reiner, and other insiders were granted the right, as of two years after the agreement, to require Motel to file a registration statement covering their shares, Art. 8.2, the cost of such registration to be paid by them pro rata.

Siegel notified the Harwyn shareholders of the Motel transaction and of the resulting transfer of control to the Group V principals on June 16, 1969. On July 31, 1969, Harwyn made a spin-off distribution to its shareholders of Harwyn's 236,000 shares of Motel. In an accompanying notice, Harwyn shareholders were told that Motel had no assets or liabilities, and that the distribution would not affect Harwyn's stated capital, capital surplus, or earned surplus.

A form-type notice was sent by Gartenberg to the National Quotation Bureau, and Motel shares appeared on the pink sheets for July 2, 1969, at $2 or $3.50 bid, $5 asked. Group V has conducted a modest amount of promotional business since its shares became publicly traded.

The fourth of these Harwyn spin-offs involved its wholly owned subsidiary Prospectus, which had been incorporated on September 26, 1961, and during its early years had engaged in the printing business. The outside principal interested in acquiring control of a public company without registration was Harold C. Yates ("Yates"), a principal stockholder of the Eastern Empire Corporation ("Eastern Empire"), a holding company organized under Pennsylvania law which owned real estate, a life insurance company, and a brokerage house. On or about June 9, 1969, Yates met with Richard J. Kirschbaum ("Kirschbaum"), who had played a small part in the Cleopatra (Academic) transaction described above, to discuss a method whereby Yates and certain of his associates could acquire a public corporation. Kirschbaum arranged for Yates to meet with D'Onofrio on June 19, 1969. Soon thereafter D'Onofrio informed Yates that a public

company was available and introduced Yates to Harwyn, Siegel and Gartenberg.

On June 20, 1969, G. Thomas Roberts, attorney for Yates, wrote to Gartenberg confirming a telephone conversation to the effect that Yates would exchange 300,000 shares of Eastern Empire stock in exchange for 1,800,000 shares of Prospectus. Siegel responded with a letter of intent dated June 24, 1969, clarifying the proposed transaction.

It should be noted here that on July 2, 1969, the Commission issued its Release No. 4982 (1933 Act) and No. 8638 (1934 Act), commenting on spin-offs of inactive or shell corporations.

On August 4, 1969, a 21-page agreement was entered into between Prospectus and Yates providing for the exchange of stock outlined above except that, at closing, the number of shares of Prospectus received by Yates and his associates was reduced from 1,800,000 to 1,-731,568, and the number of Eastern Empire shares received by Prospectus was reduced from 300,000 to 240,000. Both the amount of Prospectus stock (about 90% of the shares outstanding) and the amount of Eastern Empire stock (about 15% of the shares outstanding) constituted effective control over the respective corporations. Shortly before the signing of the agreement, on July 31, 1969, the Board of Directors of Harwyn had authorized a spin-off distribution of its 200,000 shares of Prospectus stock to Harwyn shareholders on the basis of one Prospectus share for every four shares of Harwyn. The record date was fixed as August 29, 1969, and the shares were payable on September 19, 1969. On September 17, just before the actual distribution of the Prospectus shares, members of the Commission's staff contacted Siegel and Gartenberg in an unsuccessful eleventh-hour attempt to prevent the distribution of the Prospectus stock.

By this point, as the result of four virtually identical transactions, the specific contents of the agreement signed between Harwyn, its subsidiary (in this case Prospectus) and the outside parties

(in this instance Yates) had become almost a standardized form contract. The agreement between Harwyn and Yates contained the same provisions concerning acquisition for investment, legending of Prospectus stock, the spin-off of Harwyn's interest in Prospectus to Harwyn shareholders, change of name (from Prospectus to FSI) and registration as set forth in the three preceding transactions. In addition, D'Onofrio & Feeney, Inc., a firm incorporated by D'Onofrio and Feeney (who were involved in the Cleopatra (Academic) transaction) on September 19, 1969, and Kirschbaum were named as finders and were to receive a total of 100,000 shares of Prospectus from the shares to be received by Yates and his associates.

The release which was sent to Harwyn shareholders on August 18, 1969, announcing the Eastern Empire transaction was somewhat longer than the counterpart releases relating to the earlier transactions. It contained certain basic information as to the business and management of Eastern Empire, and financial statements were enclosed. A brief notice as to the source of dividends was sent out over Gartenberg's name with the Prospectus stock when it was distributed. This notice stated that the distribution would not reduce the stated capital, capital surplus, or earned surplus of Harwyn. On September 22, 1969, Prospectus stock appeared on the pink sheets at $2 bid and $3.50 asked.

Subsequent to the consummation of the agreement, the name of Prospectus was changed to FSI. FSI has been actively engaged in the wholesale and retail rental of men's formal wear, the development of oil and gas leases, and real estate development. On June 29, 1970, FSI filed with the Commission a registration statement on Form 10 pursuant to § 12 of the 1934 Act, 15 U.S.C. § 78l.

Shortly after acquiring control of NTRR, Murphy retained a firm of certified public accountants, Arthur Andersen & Co., to audit the financial records of the company and prepare certified financial statements. These statements, of course, covered the activities of Murphy's two California corporations, which constituted the only assets of NTRR (JKM) after the transaction. On February 23, 1970, Murphy and JKM distributed to JKM's stockholders an annual report for the year ending April 30, 1969. This report .contained certified financial statements for fiscal years ending April 30, 1967, 1968 and 1969. In addition, on September 3, 1970, JKM filed with the Commission a Form 10 registration statement pursuant to § 12 of the 1934 Securities Exchange Act, 15 U.S.C. § 78l. Since Murphy's purchase of a controlling interest in NTRR, NTRR (JKM) has engaged actively in the construction business.

Finally, the Commission has brought to our attention through the affidavit of Edward F. Myers ("Myers") the subsequent "spin-off" distribution of stock in Exten Ventures, Inc. ("Exten") to the shareholders of Bicor Automation Industries, Inc. ("Bicor"), a public corporation, in July 1970. Myers stated that the firm of D'Onofrio, Feeney and Kirschbaum was instrumental in establishing the contact between Tender Corporation (the name of which was subsequently changed to Exten), and Bicor, the parent of Exten. The Commission contends that this involvement shows a propensity to violate the securities laws. The defendants dispute the extent of their involvement, arguing that D'Onofrio, et al., were merely involved as finders and had nothing to do with the subsequent spin-off. The Exten distribution was accompanied by an information statement containing more disclosure than that provided in any of the Harwyn transactions.

### Discussion

The 1933 Securities Act, §§ 5(a) and 5(c), 15 U.S.C. § 77e(a) and (c), broadly prohibits the sale of unregistered securities by any person, subject to the limitations of § 2(3), 15 U.S.C. § 77b(3), which defines a sale as "every contract or disposition of a security or interest

in a security, for value" and of § 4(1), 15 U.S.C. § 77d(1), which provides that the prohibition of § 5 shall not apply to any person "other than an issuer, underwriter, or dealer." The parties agree that the stock in the Harwyn subsidiaries was not registered under the Act and further that, in the case of "conventional" stock dividends, i. e., distribution of shares of the issuer to its stockholders, City Bank Farmers' Trust v. Ernst, 263 N.Y. 342, 346, 189 N.E. 241 (1934); Matter of Rogers, 22 App.Div. 428, 432, 48 N.Y.S. 175, affd., 161 N.Y. 108, 55 N.E. 393 (1899), no sale occurs within the meaning of § 2(3), as nothing is given for value by the shareholders. They also agree that the public shareholders of Harwyn who received stock in the Harwyn subsidiaries were not issuers, underwriters, or dealers as those terms are used in § 4(1).

Where a conventional stock dividend of its own shares is distributed by a public company that has complied with the registration requirements of the 1933 Act, subsequent purchasers of the shares have the benefit of detailed financial information about the company making possible informed investment decisions on their part. In the present case, however, the transactions we have described did not involve "conventional" stock dividends, but the distribution of a subsidiary's unregistered shares as part of a scheme to use a spin-off as a means of creating public trading of the shares. The objective of the identical series of steps followed in each of the four spin-offs (i. e. (1) a basic agreement infusing new assets into the subsidiary in exchange for issuance of control to a new management, (2) distribution of the balance of the subsidiary's issued shares to Harwyn's stockholders, and (3) the development of public trading in the latter's shares) was the immediate creation in each case of a public held company whose shares would be actively traded in the market place without the investing public having the benefit of disclosures that would be required under the 1933 Act.

Upon the record before us the foregoing objective is clearly established and not seriously disputed by defendant.[1] Putting aside for a moment the technical niceties and precise language of the 1933 Act, the effect of each agreement and spin-off was to convert a Harwyn subsidiary into a publicly held company, with the shares thus distributed to outside stockholders, of whom there were more than 500, being actively traded over the counter. The benefits to defendants were several. They avoided registration costs. More significant was the fact that although they could not, as insiders, publicly sell their own shares without registration, their ability to market or hypothecate their shares and to finance the subsidiary's operations could be greatly facilitated by the existence of an active trading market at defi-

---

1. In fact no other purpose has been advanced for any of the Harwyn "stock dividends." Harwyn had not previously declared any dividends whatsoever, either in stock or in cash. Nor does it appear that the "dividends" were required by any business purpose or necessity, such as compliance with anti-trust law or a need to segregate hazardous business activities. For instance, in reviewing the factors that may be probative of a genuine business motive under 26 U.S.C. § 355, which provides for tax-free distributions of corporate securities in certain circumstances, Professors Bittker and Eustice list the foregoing two and three additional considerations: (1) compliance with local law requiring separation of two businesses, (2) separation of a business to permit employees to share in profits or ownership, and (3) settlement of a shareholders dispute by giving each group ownership of one business. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders 484 (2d ed. 1966); see Note, The Spin Off: A Sometimes Sale, 45 N.Y.U.L.Rev. 132, 143 n. 57 (1970).

The lack of any other business purpose is further evidenced by the fact that Harwyn retained the name of each subsidiary and required the incoming control persons of the subsidiary to adopt a new corporate name, which in every case they did.

nite prices in the remaining issued shares. That such a market would develop immediately as a result of the spin-off was both contemplated and confirmed. Even before the first spin-off of Cleopatra (Academic) shares had been effected, counsel for Harwyn and the subsidiary were busily engaged in laying the groundwork for public trading by furnishing essential information to the National Quotation Bureau (see Ex. 3). As a result a market was made for the shares, with the price starting at $2.50 per share bid on January 6, 1969, and rising to $22 bid per share on March 28, 1969. Similar trading markets were established for shares of JKM (NTRR), Motel and FSI.

It is equally clear that in the case of each spin-off defendants had available to them all pertinent information with respect to the issuing subsidiary and its controlling stockholders and were therefore in a position to file registration statements setting forth such basic information as the financial condition and operating history of the subsidiary, the identity and background of the new management, and the terms and conditions of the agreements between the defendants which formed the basis of the spin-off. We are not here faced with a situation of the type which has prompted the enactment of exemptions, such as the inability of an individual who is not an issuer, underwriter, or dealer to obtain essential information required for preparation of a registration statement, § 4 (1), 15 U.S.C. § 77d(1), or the fact that purchasers, by reason of their position, already have available to them the essential information required for an intelligent investment decision, § 4(2), 15 U.S.C. § 77d(2).

Thus, regardless of the precise language of the federal securities laws, it is readily apparent that the Harwyn spin-offs violated the spirit and purpose of the registration requirements of § 5 of the 1933 Act, which is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions," SEC v.

Ralston Purina Co., 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953); Gilligan, Will & Co. v. SEC, 2 Cir., 267 F.2d 461, 463, cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). Furthermore, the registration provisions are designed not only to protect immediate recipients of distributed securities (in this case Harwyn's outside stockholders) but also subsequent purchasers from them. SEC v. Great American Industries, Inc., 407 F.2d 453, 463 (2d Cir. 1968); Oklahoma-Texas Trust v. SEC, 100 F.2d 888, 892 (10th Cir. 1939). If the shares of each of the four subsidiaries had been registered, securities dealers would have been required for at least 90 days after the effective date of the registration statement to furnish a prospectus to such subsequent purchasers, § 4(3), 15 U.S.C. § 77d(3), and those who purchased shares from outside stockholders would not only have had the benefit of the information contained in the registration statement but also of the continuing disclosures required under the technical reporting provisions of § 15(d), 15 U.S.C. § 78o(d). As it was some purchasers, not having such information as a basis for making an informed investment decision, paid high prices for their shares only to see the market price drop sharply within a year. For instance, the bid price of Cleopatra (Academic) dropped from $22 per share on March 28, 1969, to $1 per share on June 30, 1970, and the bid price of Motel dropped from $3.50 per share on August 10, 1969, to ⅛ bid on June 30, 1970.

Defendants take the position that a long-standing loophole in the 1933 Act had been recognized by the Commission and relied upon by counsel as permitting spin-offs of the type here involved to be made without registration. Defendants' argument is based upon the fact that § 5 prohibits the public "sale" of unregistered securities, which is defined in § 2 (3) of the Act as a disposition "for value." Since each of Harwyn's spin-offs to its shareholders of unregistered shares of its subsidiary was not for value received from such shareholders and rep-

resented a distribution of what they already owned, defendants contend that it amounted to nothing more than a stock dividend, or change in form of ownership, which admittedly has always been considered exempt from § 5 registration requirements. See Commission's Interpretative Release No. 33–929 (July 29, 1936).

We must concede that defendants' interpretation of §§ 2(3) and 5 is neither frivolous nor wholly unreasonable and that it appears to have been asserted and relied upon by them in good faith. Apparently it represented a view that evolved through the years as a result of the Commission's issuance in 1936 of Release No. 33–929 and its failure thereafter to dispel the interpretation generally put upon the Release by the bar. Feeding upon itself the view became accepted as a "loophole" that could be closed only by Congress. It was not until the recent sudden increase in the use of the spin-off technique as a means of converting private into public companies that the Commission became alarmed and sought to stop the abuse of what had theretofore been considered a relatively harmless crack in the integrated structure of the securities laws.

■■ Although (as we hold below) defendants' good faith reliance upon their counsel's interpretation of § 5 is a factor warranting our denial of preliminary injunctive relief, we believe that the spin-off shares in the present case were issued "for value" and should have been registered under the Act. In interpreting the statute we must look to its overall purpose, which is to provide adequate disclosure to members of the investing public, rather than engage in strangulating literalism. See SEC v. North American Research & Development Corp., 424 F.2d 63 (2d Cir. 1970); SEC v. Texas Gulf Sulphur, 401 F.2d 833, 861 (2d Cir. 1968); United States v. American Trucking Association, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). We see no reason to construe §§ 2(3) and 5 as requiring that the "value" requiring registration must flow from the immediate parties who received the stock, in this case Harwyn's shareholders. Here the so-called "dividends" were not isolated transactions; they were intimately bound up with and in the last three instances mandated by the agreements which required the outside defendants to infuse new value into the subsidiaries and which contemplated that upon distribution of the "dividend" shares to existing Harwyn stockholders public trading would occur as the result of some selling their shares to new purchasers. In such a context the chain of events must be viewed as a whole, just as it was viewed by the parties when they undertook the spin-off ventures. As Judge Medina recently stated in North American Research & Development Corp., *supra*:

"The supplementary provisions (to the registration provisions) and definitions were *so designed as to prevent any circumvention of the registration requirement* by devious and sundry means. This is one of the reasons for the broad and liberal interpretations the courts have uniformly given to this particular phase of the Securities Act of 1933." (emphasis added) (424 F.2d 71)

When the agreement, spin-off and distribution is viewed as one transaction, there was "value" received by Harwyn and the inside defendants in the form of a contribution of substantially new assets to each subsidiary and the creation of a public market in the shares with its resulting benefits to the defendants, including insiders.

Thus there was ample "value" to bar Harwyn from acting as a conduit for transformation of private companies into public ones without registration. In each of the four cases the spin-off, distribution of shares, and trading in the after-market, were inextricably bound together, with benefits flowing to all defendants. The subsidiary, of course, was the issuer of the new unregistered

shares. Harwyn, acting as the parent in control of the subsidiary, was an underwriter within the meaning of § 2(11). 15 U.S.C. § 77b(11). The other defendants jointly participated in the violations. See SEC v. North American Research & Development Corp., *supra.* This construction does not do violence to the language of the Act. On the contrary it is in accord with the Act's fundamental purposes. If spin-offs of the type here involved were exempted from registration, the purposes of the Act would be subverted and corporations could obtain public status by a novel shortcut at discount rates with virtually all corporations evading registration by the disingenuous expedient of funnelling their shares through a single public corporation.

### Equitable Considerations

■ Turning to the question of what equitable relief, if any, should issue, § 20(b) of the Securities Act, 15 U.S.C. § 77t(b), authorizes the Commission to obtain injunctive relief in the federal courts upon making a "proper showing." Although the standards of the public interest, not those of private litigation, must govern the propriety and need for an injunction in this case, SEC v. Globus International, Ltd., 320 F. Supp. 158 (S.D.N.Y.1970), we cannot infer from the language of § 20(b) that special weight is to be given to the Commission's decision to allow its staff to bring suit, SEC v. Frank, 388 F.2d 486, 491 (2d Cir. 1968). Thus in deciding whether or not to issue injunctive relief as requested, we are called upon to weigh all those considerations of fairness and justice that have been the historic concern of the equity courts, Hecht Co. v. Bowles, 321 U.S. 321, 328–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Upon a review of the undisputed facts of this case, we have decided in the exercise of our discretion that injunctive relief should not be granted. It appears to us that the granting of an injunction here would be basically inequitable, and thus we find that the Commission has not made the "proper showing" which § 20(b) requires.

The first of the facts which we deem relevant is that defendants at all times relied on the advice of counsel. Cf. SEC v. Culpepper, 270 F.2d 241, 251 (2d Cir. 1959) (advice of counsel not sought until defendants learned of Commission's investigation of them). This advice, that the transactions were legal and no registration was required, was rendered in the light of prevailing business practice, the ambiguity which surrounded the applicability of the 1933 Act to stock dividends, and the acquiescence in spin-offs of unregistered stock dividends by the Commission. The legislative history tends to support this view, for the House version of the 1933 Act included a clause, § 4(3), specifically excluding stock dividends from the requirements of § 5. See H.R.Conf.Rep.No.152, 73d Cong., 1st Sess. 25 (1933). This provision was stricken by the Conference Committee for the following reason:

> "The House provision (sec. 4(3)) exempting stock dividends and the sale of stock to stockholders is omitted from the substitute, since stock dividends are exempt without express provision as they do not constitute a sale, not being given for value."

Not only did Congress remove most doubt as to the need to register conventional stock dividends; the Commission buttressed the implicit exclusion of such dividends from the operation of § 5 by its Release No. 33–929 dated July 29, 1936, 17 C.F.R. 231.929, in which the Commission considered the situation in which stock and cash dividends were proposed to shareholders as alternatives. Distinguishing the case in which shareholders were offered stock in lieu of a cash dividend previously declared but not paid (to which the shareholders had acquired vested rights), the Commission stated that when cash and stock are presented as alternatives, no vested right

was sacrificed by the shareholder who chose stock, and thus he gave up no value. In our view the Commission's Release applied only to conventional stock dividends or splits in which there is little need for registration as the shareholders receive additional shares in a corporation whose shares they already hold, cf. Hafner v. Forest Laboratories, Inc., 345 F.2d 167 (2d Cir. 1965) (under the circumstances, no need for insider to reveal impending stock dividend as material under § 10(b) of the 1934 Act.) There is evidence, however, that sophisticated counsel have construed the Release as applying also to a "spin-off" distributions to an issuer's stockholders of the unregistered shares of a subsidiary. In the absence of clarification by judicial decision (which we have attempted above) or by further Commission release, we cannot say that the view of defendants' counsel was frivolous or taken in bad faith.

The parties also refer us to the Commission's Release No. 33–4982 dated July 2, 1969. This Release, issued subsequent to three of the Harwyn distributions, considered the hypothetical case in which a privately-held company issues its unregistered shares to a public company, possibly for nominal consideration, and the public company subsequently spins off these unregistered shares to its shareholders as a dividend. While holding that the dividend itself, standing alone, might not constitute a distribution for purposes of the Act, the Commission stated that the role of the public corporation in a process which was intended to lead to public trading in stock of the private company was that of an underwriter under § 2(11) requiring registration of the shares, since the public company purchased the shares from the issuer (private company) with a view to distributing them as a stock dividend to the issuer's own shareholders.

Unquestionably the July 2, 1969 Release might lead astute counsel to question the legality of spin-offs of the type here under consideration, in view of the fact that the process used to create public trading in the unregistered shares was similar. However, there are differences between the two situations, which are somewhat compounded by the following statement in the Commission's Release:

"This release does not attempt to deal with any problems attributable to more conventional spin offs, which do not involve a process of purchase of securities by a publicly-owned company followed by their spin off and redistribution in the trading markets."

■■ On the basis of the legislative history, the Commission's 1936 Release, the silence of the Commission in the face of various other unregistered stock dividends, and the Commission's issuance of "no action" letters in regard to certain stock dividends, defendants' counsel were convinced that the stock dividends which their clients contemplated were not required to be registered. While prior practice does not estop the Commission from changing its view in the interest of protecting the public against possibly fraudulent activities, SEC v. Culpepper, supra, 270 F.2d at 248, and a bona fide but mistaken belief in the legality of a transaction is no defense to an action by the Commission, SEC v. W. J. Howey Co., 328 U.S. 293, 300, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), prior practice is relevant to the reasonableness of the advice of counsel on which defendants relied, and defendants' good faith reliance on legal advice has a significant bearing on the likelihood that additional violations will occur.

In addition, counsel for Harwyn contacted both the New York and Washington offices of the Commission in an effort to learn the Commission's view as to the need for registration in the Harwyn transactions. Cf. SEC v. Culpepper, supra, 270 F.2d at 251 (initially, no attempt made to discover Commission's

opinion). Despite its alleged growing concern over the increasing use of stock spin-offs as a means of avoiding the registration requirements and its professed desire to protect the public, the Commission gave no answer to these inquiries by Gartenberg. Had Gartenberg then been informed of the Commission's position as it was unfurled in the complaint and motion papers in this action, which was many months after his initial inquiry, we have no doubt that he would not have condoned these transactions. Had the Commission sought preliminary injunctive relief promptly upon learning from Gartenberg of Harwyn's intentions and before the transactions materialized, or had it given an opinion with which Harwyn had not complied, cf. SEC v. Keller Corp., 323 F.2d 397, 399 (7th Cir. 1963), we might have been disposed to grant the preliminary injunction now requested. Instead, the Commission waited until the horse was gone—indeed, watched it amble away—before seeking to lock the barn door.

Moreover, even when the Commission made a belated statement of its views in the 1969 Release, the Harwyn-type transaction was not specifically considered. The 1969 Release included an ambiguous qualification (quoted above) which could be, and has been by defendants' counsel, taken to imply that the 1969 Release did not venture any opinion as to the Harwyn-type transactions. In view of the fact that the Commission staff must have known of the three transactions which Harwyn had completed at the time when the Release was issued, it is difficult to understand why the Release did not deal with this problem.

In addition to acting upon advice of counsel and to the Commission's failure to dispel the inferences which could be, and had been, drawn from its 1936 Release, all defendants received legended stock. They represented that they acquired this stock for investment, and "stop transfer" orders were placed with the transfer agent to assure insofar as possible that their shares would not enter the market. Although one defendant, Temkin, has made certain exempt gifts, the other defendants have not sold, transferred, pledged or hypothecated any of their stock. While the harm to the public from trading in unregistered securities is not thereby reduced, defendants have not profited from their transactions. Two of the spun off companies —JKM and Eastern Empire—are now filing Form 10 registration statements, which will provide information to the public about these companies.

Finally, counsel for defendants have assured the court that since the Commission has made known its views by commencement of this action their clients will not engage in further distributions of the type in question without registration. We find this assurance significant in considering "the critical question" of "whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby," SEC v. Culpepper, *supra*, 270 F.2d at 249. The evidence presented by the Commission as to the likelihood of repeated violation —i. e., D'Onofrio's involvement in the Exten-Bicor transaction and the alleged existence of additional Harwyn subsidiaries—is unpersuasive. While cessation of illegal activities is no bar to our issuance of a preliminary injunction in this case, United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), and past illegal conduct may give rise to an inference that future violations will nevertheless occur, SEC v. Keller Corp., *supra*, 323 F.2d at 402, we do not draw such an inference in this case. Furthermore, we must not forget that the issuance of an injunction can sometimes have a harmful impact on the personal reputations and legitimate business activities of defendants, SEC v. Broadwall Securities, Inc., 240 F.Supp. 962, 967 (S.D.N.Y.1965) ("The adverse effect of an injunction upon defendants is, of course, a factor to be considered

* * *''). Moreover, at least in the cases of Murphy and Yates, who are actively engaged in operating their businesses, the nature of the transaction complained of—involving public distribution of shares, which is now a *fait accompli*—suggests that it would be unreasonable to expect further violations.

For all the foregoing reasons, in the exercise of our discretion, we find that the Commission has not made a showing under § 20(b) that warrants injunctive relief.

The Commission also moves, under § 21(e) of the 1934 Securities Exchange Act, 15 U.S.C. § 78u(e), for a preliminary injunction restraining violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j (b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. Section 21 (e) employs substantially the same language as § 20(b) of the 1933 Act, and the standards for issuance of an injunction under either Act are substantially the same. Whether or not a § 10(b) violation would be found on the basis of these facts, however, an injunction under § 21(e) for violation of § 10(b) is not warranted for reasons set forth in our consideration of the Commission's claim under the 1933 Act set forth above. Accordingly, although we have expressed our opinion as to the necessity for registration of Harwyn-type spin-offs in order to furnish guidance to the parties and others contemplating similar transactions, there appears to be no such necessity for passing upon the question of whether defendants' activities also violated the anti-fraud provisions of the federal securities laws.

The foregoing shall constitute our findings of fact and conclusions of law in compliance with Rule 52(a), F.R.Civ. P.

The Commission's motion for preliminary injunctive relief is denied.

It is so ordered.