### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

### AMERICAN REALTY TRUST, Defendant.

### Civ. A. No. CA 76–104A.

United States District Court,
E. D. Virginia,
Alexandria Division.

Feb. 24, 1977.

Catherine Gallagher, Vernon J. Vander Weide, Michael A. Starr, S.E.C., Arlington, Va., for plaintiff.

Louis Koutoulakos, Arlington, Va., Philip N. Smith, Washington, D. C., for defendant.

## OPINION AND ORDER

KELLAM, Chief Judge.

This action for injunctive and ancillary relief is brought by the Securities and Ex-change Commission (SEC) pursuant to § 20(b) of the Securities Act, 15 U.S.C. § 77t(b) and § 21(d) and (e) of the Exchange Act, as amended, 15 U.S.C. § 78u (d) and (e), against American Realty Trust (ART) and Thomas Broyhill (Broyhill). Jurisdiction is alleged under § 22(a) of the Securities Act, as amended, 15 U.S.C. § 77v(a), and §§ 21(e) and 27 of the Exchange Act, as amended, 15 U.S.C. §§ 78u(e) and 78aa.

Defendant ART, 200 Jefferson Davis Highway, Arlington, Virginia 22202, is a real estate investment trust[1] created under District of Columbia law pursuant to a Dec-laration of Trust dated July 14, 1961, with its principal office in Virginia. As of the date of the last available annual report for the year ending September 30, 1975, a sub-stantial majority of the assets of ART was in the form of equity investments in hotels, motor inns and restaurant properties oper-ated by lessee companies. Defendant Broy-hill, 1475 20th Street, North Arlington, Vir-ginia, is President and Chairman of the Board of ART.

The Commission's complaint filed on Feb-ruary 9, 1976 contains three counts against ART and Broyhill, alleging past and present violations of numerous securities laws and further alleging that unless the relief allud-ed to above is granted, defendants will con-tinue to violate such laws.

Count I alleges defendants violated the anti-fraud provisions of the Securities and Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, 17 CFR 240.10b–5 and § 17(a) of the Securi-ties Act of 1933 (Securities Act), 15 U.S.C. § 77q(a) by using fraudulent devices to sell securities. More specifically the SEC alleg-es defendants violated the above cited pro-visions by their committing acts of fraud in the offer and sale of $15 million worth of nine and one-half per cent senior subordi-nated debentures due March 15, 1979.

Count II alleges violations of § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), Rule 13a–1 thereunder, 17 CFR 240.13a–1 and

---

1. Real Estate Investment Trust (REIT) is a business trust for the purpose of holding as-sets, in which the shareholders directly own an undivided interest and is unlike a corporation whereby the stockholders have no direct own-ership interest.

3

53**

Rule 12b–2 under the Exchange Act, 12 CFR 240.12b–20, which require the filing of certain reports with the Commission and further directing that they not be misleading.

Count III alleges that defendants, by soliciting proxies by means of improper proxy material, violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a–9 thereunder, 17 CFR 240.14a–9, which requires that proxy soliciting material be filed with the SEC and that it not be misleading.

On the basis of these alleged violations, the SEC seeks an injunction permanently enjoining defendants from violations of the Securities Act and the Exchange Act and an order requiring Thomas Broyhill be removed from his positions of President, Director and Trustee of ART; that the Court appoint such additional trustees as it deems appropriate; that ART be required to conduct a complete investigation of all outstanding loans and receivables; that ART be required to file corrected annual reports, and requesting any other relief that this Court may deem just and proper.

██ The basis for all three counts of plaintiff's complaint is the alleged failure to disclose five transactions. Count I alleges that disclosure of the transactions was omitted from a prospectus used by ART to sell debentures in March, 1974. Count II alleges that the annual reports of ART on Form 10–K for the years ending September 30, 1974 and 1975 (1975 10–K and 1976 10–K) which were filed with plaintiff, were materially misleading because of their failure to disclose all the pertinent facts referred to in Count I above.[2] Count III alleges that the proxy soliciting material used by ART did not disclose the transactions referred to in Count I.

Immediately upon filing the complaint, the SEC moved for a preliminary injunction. An evidentiary hearing on the motion was subsequently consolidated, pursuant to Rule 65(a)(2), Fed.R.Civ.P., with an accelerated trial on the merits and the case was tried to the Court without jury on April 13 and 14, 1976. Each party requested the record be transcribed and they be permitted to file briefs. The briefs having now been filed, and the Court having considered the record, together with the briefs, submits its findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

### FINDINGS OF FACT

#### Offer and Sale of Securities

Beginning on or about March 12, 1974 ART and Broyhill distributed or caused to be distributed to investors and prospective investors a prospectus purportedly describing in all material respects, the securities offered in connection with the offer of $15 million of ART nine and one-half senior subordinated debentures due March 15, 1979. Approximately $3.4 million worth of the debentures were eventually sold to the public.

It is stipulated by all parties that in connection with the offer, purchase and sale of securities referred to in the preceding paragraph, ART and Broyhill made use of the means and instruments of transportation or communication in interstate commerce and of the means and instrumentalities of interstate commerce or of the mails.

In addition, it is stipulated that on or about March 14, 1975, ART and Broyhill, by use of the mails or by the means or instrumentalities of interstate commerce or of the facilities of a national securities exchange, solicited proxies or consents or authorizations with respect to ART's securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, by means of a proxy statement, form of proxy, and notice of meeting.

---

**2.** Count II also alleges that the 1976 10–K was filed late and that the auditors for ART expressed no opinion on the financial statements contained therein, and all three counts allege that the documents failed to disclose that Broyhill was violating his fiduciary duty. Any determination of Broyhill's alleged breach of fiduciary duty depends upon whether the transactions discussed *infra* were fraudulent or were not fully disclosed as required by federal law. The fact that a single report was filed late does not, standing alone, constitute a basis for relief against the defendants.

Defendants filed or caused to be filed two annual reports with the SEC on Form 10–K, that also form part of the basis of this suit, the first on or about December 30, 1974 covering ART's fiscal year ending September 30, 1974 and the second on or about February 5, 1976 for ART's fiscal year ending September 30, 1975. The annual report on Form 10–K filed on or about February 5 was not filed by the due date of December 30, 1975, and the SEC had not extended the due date of the report.

### The Vouchers

■ A large percentage of ART's holdings in the fall of 1973 consisted of hotels and motels located in Virginia and the District of Columbia. ART had leased several of them to Virginia Hotel Management Company, Inc. (VHM) to operate since December 1, 1971, in order to preserve its tax status as a real estate investment trust. Under the leasehold agreements, VHM was responsible for the management of the hotels and any profits generated therefrom belonged to VHM. In return VHM paid monthly rental payments to ART for each of the properties it operated. The March 1974 prospectus of ART stated that VHM operated seven of ART's nine hotels and motels. One of these hotels was the Williamsburg Hospitality House Motor Inn (Hospitality House) in Williamsburg, Virginia, which opened for business on April 15, 1973. According to the 1974 prospectus, VHM's rental on the Hospitality House for the period April 15, 1973 to March 31, 1974 was $70,083.33 per month. For that same period of time, monthly rent on the other ART properties leased by VHM totaled $70,200.00 per month.

In May of 1975 a series of parties were held in celebration of the grand opening of the hotel. The parties, which were held at the hotel, consisted of cocktails, dinner and dancing on both Friday and Saturday evenings, May 11 and 12, 1973, and a Sunday brunch. In addition, a large number of guests were provided rooms at the hotel on Friday and Saturday evenings, and a few of the organizers stayed at the hotel on Thursday evening. An itemized bill for $28,100.87 from VHM was delivered to ART personally by Mr. Charles Simmons (Simmons), president of VHM. VHM subsequently received a check from DeLuca Construction Corporation (DCC) for $128,100.87, $100,000 of which represented payment of a consultant's fee due DCC, and the remaining $28,100.87 of which was for the opening party at the Hospitality House. ART in turn reimbursed DCC for the expenses of the opening party and for the consultant's fee to VHM.[3] Both officials at ART and John DeLuca (DeLuca) believed the bill represented expenses for only one day of the opening celebration and therefore did not constitute payment in full for all costs incurred by VHM for the grand opening festivities.

From June to September of 1973, VHM experienced difficulty in the management of the Hospitality House because business was poor. As a result, rent on the Hospitality House due ART was in arrears for three months on September 28, 1973, in the amount of some $210,000, and the September rent would be due in two days.

During September 1973, representatives of ART were working with their underwriters in preparing for the eventual sale of a large quantity of senior debentures and the underwriters were encouraging ART to clear up the rent arrearages on the VHM leases.

On September 28, John Rutledge (Rutledge), executive assistant to Broyhill, telephoned Terry W. Vester (Vester), Vice President and Treasurer of VHM, requesting that VHM's rental payments be brought up to date. Vester responded that only $210,000 of the $280,000 (including the September rent which was due and payable in two days) could be paid by VHM at that time. Vester, in his testimony at trial, suggested that Rutledge outlined a plan where-

---

**3.** Such an arrangement was not unusual in the construction business. On many occasions the general contractor, in this case DCC, pays such expenses as consultant's fees and opening celebrations and is subsequently reimbursed by the owner of the developed property.

by Vester would submit fictitious or grossly inflated bills to ART for trustee functions and the grand opening parties that would amount to $70,000, the amount that VHM was unable to pay. The Court concludes that Vester did not prepare the bills at the direction of an employee of ART, but rather prepared the bills independently and submitted them to Simmons for delivery to ART for payment. Vester did not inform Simmons that the vouchers were erroneous in any respect,[4] and ART promptly paid the bills, believing them to be justified.[5]

Accordingly, the Court finds no material omission in ART's March 12, 1974 prospectus, ART's annual report on Form 10–K for the year ended September 30, 1974, ART's proxy statement dated March 14, 1975, and ART's annual report on Form 10–K for the year ended September 30, 1975.

### The $368,000 Loan Transaction

■ VHM continued to incur difficulty in making monthly rental payments to ART and by February 1974, VHM owed ART approximately $350,000 .in back rent.[6] In fact, business was so poor that VHM was concerned if it could meet its February payroll of $18,000. During February the underwriters were proceeding with preparations for the March 1974 prospectus and warned ART that if the rent arrearages were not brought current, the prospects of the underwriting would be damaged. Broyhill subsequently telephoned Simmons at VHM and requested immediate payment of the rent arrearages. Simmons responded that this would not be possible in light of VHM's financial condition. Broyhill then

suggested that Simmons procure private financing in order to meet its rental obligation to ART, but Simmons countered that it would be highly unlikely that any financial institution would make such a loan in light of VHM's financial balance sheet. At that point Broyhill stated that he would see if he could help in arranging financing so that the rent arrearages could be paid off and the February payroll met.

Broyhill then asked John DeLuca if Arlington Ridge Road Associates (ARR) would lend the money to VHM. ARR is a Virginia partnership consisting of two partners, Joel Broyhill and John DeLuca, which was acting as a general contractor in building a condominium [7] for the Trust.[8] After obtaining the approval of his partner, DeLuca agreed to make a loan to VHM if ART would pay ARR the amount owed under the loan commitment and requisitioned by ARR for construction. The Board of Directors of the Hospitality House subsequently approved the loan application. On February 22, 1974, Simmons, responding to Broyhill's invitation, went to the offices of ART where he and Vester submitted a number of checks payable to the order of ART, totalling $350,649.99, representing payment of rent arrearages. They were then given a check by DeLuca from ARR for $368,000, for which they signed a $368,000 promissory note and provided a substantial percentage of VHM stock or equivalent thereof as collateral. On the same date ART made payments to ARR for obligations outstanding and due on the condominium project, "The Representative." One of the checks was drawn in the amount of $368,000 and the

---

4. Vester told Simmons that the bills he submitted were, in part, for future functions and meetings of ART.

5. It will be remembered that officials at ART believed that the Trust still owed a substantial amount for the grand opening festivities and subsequent trustee meetings.

6. VHM, as of February 22, was in arrears for the months of October, November and December, 1973 on the Hospitality House and December, 1973 and January, 1974 on the other properties rented from ART for a total of approximately $350,000.

7. The condominium project was named the "Representative."

8. As a REIT, ART could not construct and manage the condominium project itself. Therefore, it made a substantial loan commitment to ARR to build and operate the condominium for a substantial interest rate and a percentage of the profits. See pp. 1163–1167 *infra* for a more detailed discussion of this transaction.

other was for $108,000. As broadly outlined above, both advances were pursuant to requests by ARR for draws on the loan commitment. The March 1974 prospectus of ART refers to this transaction in several places. See Pt. Ex. 2, pp. 3, 4, 21 and 35. The prospectus at page thirty five disclosed how much money had been advanced ARR:

> As of March 11, 1974, $1,339,209 has been advanced ARR on an unsecured basis, which funds the Trust is advised has been used *in part* (emphasis added) by the partnership for construction costs.

Immediately after disclosing the relatively poor financial condition of VHM, the prospectus states on page 21:

> "The Trust is advised that on February 22, 1974, Arlington Ridge Road Associates Limited Partnership (See 'Equity Investments'—'Arlington Ridge Road, Arlington, Virginia' under 'Present Investments of the Trust'), a limited partnership to which the Trust has leased certain land, and to which the Trust as of the date of this Prospectus had disbursed $1,339,209 under a construction loan commitment, loaned $368,000 to the lessee, which is repayable December 31, 1976. The loan to the lessee, part of the proceeds of which was used by the lessee to pay certain of its rent arrearages to the Trust in February, 1974, bears interest at an annual rate of 6%, payable at maturity. In the event of default the lessee could be obligated to issue to the limited partnership stock of the lessee corporation in an amount equal to 49% of that outstanding after the issuance. This stock would be in payment of the loan. The Trust is advised that its President, Thomas J. Broyhill, interceded in connection with the making of this loan."

Plaintiff asserts in paragraph 11(c)(3) of the complaint that the prospectus should have said that defendant Broyhill *arranged* the transactions. Although the language

"*interceded* in connection with the making of this loan" (emphasis added) is subject to varying interpretations, the Court finds that the use of such language was not fraudulent or misleading. An average investor, i. e., a reasonably prudent investor, would not be misled by such subtle variations in terminology.

■ Plaintiff also alleges that the transaction itself was fraudulent, but the Court finds that the checks drawn to the order of ARR from ART and delivered to ARR on February 22, 1974 represented payment for legitimate obligations due and payable on that date.[9] Therefore, the money lent VHM by ARR was not the money of ART. Though not relevant to this action, the amount of the loan was repaid with interest by VHM within the proscribed period of time.

### The Lexington Hotel Construction Contract

■ Plaintiff also alleges in paragraph 11(b) of the complaint that defendant Broyhill executed on behalf of ART a contract for the construction of a hotel in Lexington, Kentucky without the approval and contrary to the intentions of the Executive Committee or the Board of Trustees of ART and that he directed that the official minutes of the Trust be altered so as to indicate authorization of the contract's execution by Broyhill. Plaintiff further alleges in subparagraph 11(b)(3) failure on the part of Broyhill and ART to fully disclose the circumstances surrounding the execution of the Lexington Hotel contract and the subsequent ratification of Broyhill's action by the Board of Trustees.

It is clear on the face of plaintiff's allegations that the execution of the contract was at least subsequently approved by the Board of Trustees of ART. Plaintiff contends, however, that Broyhill did not have the authority to sign a contract for con-

---

**9.** In fact, ART owed ARR approximately $821,000 in back construction draw payments pursuant to the loan agreement on that date because ART had until that time been unable to fund the full amount called for under the loan arrangement. With the imminent intervention of Chase Manhattan Mortgage, however, ART was going to start making their payments again pursuant to the agreement. As indicated earlier, the $368,000 represented only part of the payment made by ARR on that date.

struction of the Lexington Hotel on the date of execution.

According to the prospectus of March 12, 1974 and stipulated to by the SEC, the Trust acquired the parcel of land in Lexington, Kentucky upon which the hotel was later to be built from the Urban Renewal and Community Development Agency of the City of Lexington. An excavation contract was let on July 10, 1973 and all excavation was complete by the middle of November, 1973. It is also undisputed that the officers of ART received authorization to advertise for bids on the construction of the hotel project.

It is not as certain, however, whether Broyhill received expressed formal authorization to execute the construction contract before he signed it on behalf of ART on October 30, 1973. Defendants assert that even if no expressed formal authority was given, Broyhill, as President and Chairman of the Board, had implied authority to do so by virtue of Section 8.5 of ART's Declaration of Trust.[10] Plaintiff counters that the above cited grant of power does not give him such expansive authority. Plaintiff, however, put forth no evidence to substantiate that view, failing even to inquire of the Trustees of ART whether Broyhill had overstepped his bounds in executing the contract without prior expressed approval. In the absence of such testimony, there is no evidence that any member of the Executive Committee expressed disapproval of Broyhill's "unauthorized" execution or made any attempt to discipline him or remove him from office. In any event, plaintiff argues that if the President possessed such broad authority by virtue of ART's internal policy "to execute $5.8 million contracts without as much as even implied authorization from other trustees, then a general statement of this policy should have been disclosed to investors and potential investors of ART securities." (Pt. Reply Brief at p. 11) This Court need not reach that issue because it finds that Broyhill received implied authority and quite possibly expressed authority from the Board of Trustees to execute the Lexington construction contract.

Plaintiff submits that the contract was not *formally* approved prior to October 30, 1973. A close examination of the minutes of the Trustees' Executive Committee meetings and the Quarterly Trustees meetings seems to support that contention. According to the minutes of September 10,[11] September 24,[12] and November 12, 1973,[13]

---

**10.** Section 8.5 states in part:

"The Trustees shall annually elect from their number a Chairman of the Board (and) and President. . . . In the absence of designation from time to time of powers and duties by the Trustees, the officers shall have such powers and duties as generally pertain to their respective offices." *See* Pt. Ex. 1. There is no evidence in the record indicating that the Trustees made any such designation of powers and duties.

**11.** *See* Pt. Ex. 20. Under the item "Hotel Lexington-Construction Bids," the minutes state that "General contractors bids on the Hotel Lexington (project) were discussed in detail by the Committee. A possible management company was also discussed, whereby no further action was taken, and the matter was tabled for a later date." Of course it is possible to infer that the Trustees assumed that the contract would be executed by Broyhill since they were discussing a possible management company. The statement that no further action was taken could have been referring to the discussion about the management company.

**12.** *See* Pt. Ex. 21. Under the topic IV "Hotel Lexington-Construction Bids," the minutes state: "A further review was presented in reference to general contractor bids on the Hotel Lexington. A motion was made that no further action be taken at this time and that the matter be tabled for a later date."

**13.** *See* Pt. Ex. 18, 18–A. Item V on the typed agenda was entitled "Lexington Hotel, Lexington, Kentucky-approval of G/C contract with C. E. Pennington Co."

Harding wrote under this item on the typed agenda "Put in minutes of 10/9/73 per JRR." In his handwritten rough notes, Harding wrote that "a motion to borrow $4 million in Lexington, Ky.—Turnkey job—was tabled . . . until Thursday." He also wrote that Arthur Pomponio was in disagreement and wanted to get out. In addition, he noted that "Broyhill said that it would take '$50,000 to keep it alive' and that ART had 'paid $500,000 in it now.' "

The typed minutes of the November 12th meeting (Pt. Ex. 18–A) state that "after further discussions on the Tourist and Convention possibilities in Lexington and financing on the hotel, it was agreed to table further action on

the Executive Committee of ART's Board of Trustees discussed the Lexington project but did not "formally approve" the Lexington construction contract. Defendants have not asserted that these minutes are inaccurate. The minutes of the October 22nd Executive Committee meeting, as well as the minutes of the October 23rd quarterly Board of Trustees meeting, contain no reference to the Lexington hotel contract. Randolph Rouse, a trustee of ART, stated, however, that he thought the Lexington project was discussed at the October 23rd meeting, but he does not remember any formal vote being taken. The trustees at the October 23rd meeting did approve in one motion all actions taken by the Executive Committee since the last quarterly meeting of the trustees held on August 11, 1973.

The records of the October 9, 1973 Executive Committee meeting are a matter of substantial dispute. Plaintiff argues that Broyhill directed Chester Harding to alter the official minutes of the meeting to have inserted a resolution formally authorizing him to execute the construction contract. Plaintiff, however, has introduced no evidence that Broyhill himself directed Harding to do so or that another officer of ART directed Harding to do so per Broyhill's directions. In fact, Broyhill testified in his deposition that he rarely ever examined the official record book of ART where all official minutes were placed, and that he signed copies of official minutes pro forma without examining them. In addition Harding admitted that he never indicated to Broyhill that he was signing a set of altered minutes.

During this period of time the Executive Secretary of ART, Chester R. Harding, Jr., was responsible for preparing minutes of all formal Trust meetings, including those of the Executive Committee and the Board of Trustees. It was his practice to take rough notes of what transpired at the meeting and later prepare a formal set of handwritten minutes based on those rough notes for submission to a secretary for typing. After receiving the pro forma signature of Broyhill, the minutes were disseminated to the trustees and were usually approved by voice vote at the next meeting.

Nowhere in Harding's testimony at trial does he specifically state that he was directed to insert a formal resolution authorizing Broyhill to enter into the contract,[14] and even if such testimony were present, the Court places little reliance on his testimony.[15]

It is clear, however, that the first set of minutes of the October 9, 1973 meeting distributed by Chester Harding, see Pt. Ex. 14–A, did not contain any reference to the Lexington project, nor do any of his rough notes, handwritten minutes, or the typed agenda.[16] Harding later prepared a second

---

the hotel until a later date when a further study can be made."

The differences between Harding's rough notes of the meeting and the typed minutes that he ultimately prepared is rather perplexing. The only thing that is certain is that the language about tabling further action pending further study need not be referring to the approval of the construction contract, but may well have been referring to the construction *loan*.

14. *See* Harding's testimony at TR 235. According to Harding's own testimony, Rutledge never expressly ordered him to place a formal resolution in the minutes. He was simply told to make a note of the execution of the Lexington construction contract in the minutes.

15. *See* Defendant's September 23rd Brief at p. 12. *See also* TR 261–284.

16. The Court finds no merit in defense counsel's argument that the fact that sections of the first set of minutes are number I, II, III and V, omitting number IV, while in the revised minutes (Pt. Ex. 15) the resolution authorizing execution of the Lexington hotel construction contract is added as the missing number IV supports their contention that a formal resolution was approved at the October 9th meeting. An examination of Harding's rough notes, handwritten minutes, and the typed agenda for the October 9th meeting disclose that the listing "Herndon Shopping Center" consistently appeared as number IV. Therefore, the mis-numbering does not support Defendant's argument that the error consisted of the typist leaving out the Hotel Lexington section, but rather it appears that the "Herndon Shopping Center" heading which had been consistently numbered as IV was inadvertently numbered V by the typist readying the minutes for publication.

set of minutes of the October 9th meeting in which he inserted a formal resolution authorizing Broyhill to execute the Lexington Hotel contract. *See* Pt. Ex. 15. Although it is possible that a vote on the contract would have been unanimous on that occasion,[17] the Court finds it highly improbable that such a formal resolution was approved at that meeting. No trustee or officer of the Trust had any knowledge of any formal resolution regarding the Lexington deal being approved at that meeting. The Court, however, finds that the SEC, on the basis of all the evidence, has not proven its allegation of intentional cover-up on the part of Broyhill or by an officer under his direction.[18]

The only other Executive Committee meeting the subject of any testimony on this issue took place on November 27, 1973. The topic of the Lexington Hotel contract appeared on the agenda as item III. *See* Pt. Ex. 19. Harding wrote in his rough notes that Arthur Pomponio, another trustee of ART, reported to the committee that "the construction contract has now been signed." Harding noted that Pomponio is "very mad," and wanted to know "why it (was) put in the agenda." Irwin Potter,[19] according to Harding's notes, suggested that they get out and put a stop to construction. Broyhill responded that he "would review the situation and see about

holding off." There is no other notation in his notes indicating that any other trustee expressed surprise that Broyhill had signed a contract with the lowest bidder for the construction of the hotel. The official typed minutes of the meeting stated:

"A discussion was held in view of the energy crisis and its bearing on the convention and tourist attractions to Lexington, Kentucky. It was suggested by the Committee to review and study further the possible effect that the crisis will have on the profitability and feasibility of the Lexington Hotel."

A comparison of Harding's rough notes and the formal minutes reveals some rather broad discrepancies. A reading of the minutes alone would not indicate to even the most discerning reader that the contract had already been signed and that the information was relayed to the Trustees. The language is very similar to that used in the official minutes of September 10 and September 24.[20] Therefore, it is impossible to determine by mere examination of the minutes and notes alone whether Broyhill ever received expressed or implied authority to proceed with execution of the contract. After close examination of all the evidence in this action, however, the Court finds that Broyhill was given informal authority, whether that authority be expressed or implied, to proceed with the Lexington con-

---

The Court, however, does not infer from this that the contract was not discussed at the October 9, 1973 meeting, or that informal authorization was not extended to Broyhill to execute the hotel contract at that time. As the Court pointed out earlier, the minutes seem incomplete, and at times even inconsistent. The Court will not place primary emphasis on the minutes of the Executive Committee meetings and the Quarterly Board of Trustees meetings in making its determination on this issue.

17. Arthur Pomponio, the only trustee at that time unilaterally opposed to the project, was not present at the meeting.

18. The SEC seems to place emphasis on the fact that Harding failed to send the corrected minutes out to the Trustees, but nowhere in his testimony does he state that he was instructed by anyone not to do so, and it is uncontroverted that Harding was the officer charged with the responsibility of doing so.

19. Potter also was a Trustee of ART.

20. As indicated earlier, this is not the only discrepancy between either Harding's notes and the official minutes, or his notes and minutes and the testimony of Plaintiff's witnesses. For example Pomponio recalled that he did not think that he knew of the signing of the contract at that meeting, yet Harding wrote in his notes that Pomponio in fact reported that the construction contract had been signed, that he was mad about going ahead with it, and wanted to know why it was part of the agenda ("Approval of Construction Contract"). However, at his deposition Pomponio testified that he never said "Why was it put on the agenda":

"Q. Do you recall saying, Mr. Pomponio, 'Why do you put it on the agenda if the contract has already been signed?'
A. No, I don't have any recollection of using that language." (PD at p. 48)

tract by accepting the lowest bid made by a responsible contractor. Because Broyhill possessed such authority, no formal approval of the construction contract was necessary before its execution. There are a number of items in the evidence that support the Court's finding.

As indicated on page 1156, *supra*, there is no dispute that the Trust authorized Broyhill to execute a contract for the purchase of the property for the purpose of building a hotel. An excavation and foundation contract was also approved by the Board.

Mr. Cooper, a member of the Executive Committee, attended the official ground breaking ceremonies on behalf of the Trust. It is also not disputed by the SEC that the Executive Committee authorized open bidding on the construction contract, and that several bids were received by the Trust from reputable builders in the area. In addition, it is uncontroverted that C. E. Pennington, the general contractor who received the construction contract, was the low bidder on the project and enjoyed a reputation for being a dependable builder.

The Court can certainly infer from these facts that Broyhill had informal approval to accept the lowest bid and proceed with execution of the contract.[21]

The SEC presented little evidence to dispute that inference. It did offer the testimony of several trustees[22] who testified that they did not recall ever *formally* approving the Lexington contract in advance of its execution. However, only the testimony of one trustee, Irwin Potter, could *arguably* support their contention that Broyhill lacked even informal authorization, either expressed or implied. Potter, however, never flatly stated that Broyhill had no such authorization, but rather asserted that "I do not recall ever approving the construction contract for the Lexington Hotel."[23]

On the other hand, there is additional evidence to support the inference that Broyhill possessed authorization, either expressed or implied, to enter into the contract on behalf of ART. Arthur Pomponio, while testifying that he never formally authorized the execution of the contract by

**21.** In fact, one of the Trustees made the same deduction, stating: "Mr. Broyhill did sign the contract with Pennington without formal vote by the Trustees or the Executive Committee. In my opinion, he had authority to do it, because you certainly don't sign a contract to build a foundation and dig a hole in the ground to start something because we were committed to the city officials of Lexington. This was a redevelopment area." (Cooper's Dep. at p. 50)

**22.** Trustees Rouse, Potter, Pomponio and Cooper. Rouse, however, was not a member of the Executive Committee and attended none of its meetings during the period in question.

**23.** TR at p. 409. Potter severed his relationship with the Trust in early 1975 because of his intense displeasure with the management of ART. His testimony is contradicted at several points by the testimony of others in this action. For example, he stated that he never remembered approving the excavation contract, but even the SEC admits that approval for the excavation contract was given. Potter also testified that he opposed the construction project, and maintained, as did the SEC in its complaint, that the prevailing opinion of the Trustees was against approval or ratification of the Lexington construction project. The Court, however, finds little evidence to support that view. Arthur Pomponio, the leading opponent

of the project, in fact stated that he was the only one in the end to oppose the project and that even he voted to approve the construction loan for the project at a meeting of the Executive Committee held on February 5, 1974. Potter, according to the minutes and his own testimony, made no attempt to overturn the execution of the construction contract by Broyhill or to reprimand him for his "unauthorized" actions. Potter also testified that he does not remember the contract ever being ratified by the Trustees, but the Court has found substantial evidence to support such ratification, and the SEC has not asserted that the construction contract was not subsequently ratified. In fact, Potter, according to the minutes of February 5, was appointed to a committee overseeing the leasing and selling of the property. At that same meeting the Committee voted to approve a permanent construction loan for the Lexington project.

Finally, Potter admits that he signed the prospectus dated March 12, 1974 after extensive review of its contents. Potter never argued that the Lexington project was not adequately disclosed in the prospectus, and he never attempted to insert additional language in it indicating that the execution of the construction contract on October 30, 1973 by Broyhill was unauthorized.

Broyhill before its execution date, noted that Irwin Potter had submitted a favorable report to the Trustees regarding Lexington's ability to float bonds for a Tourist and Convention Center, a project deemed essential by most to the success of the hotel. Pomponio was a persistent critic of the project almost from its inception, although he did vote in favor of purchasing the land. According to Pomponio, a formal vote authorizing approval of the Lexington construction contract did not come until after submission of his formal report.[24] Unfortunately, the report was never submitted into evidence and the SEC offered no evidence to indicate its date. Pomponio was obviously confused about dates, stating at one time that he went to Lexington in the spring, while in fact, he went there sometime in the fall of 1973.[25]

Pomponio first received notice that the Lexington construction contract had been executed from John Rutledge as Pomponio was leaving the Trust's headquarters on his way back to Lexington. He recalls attending a meeting of the Executive Committee a few days after his return from Lexington, although he cannot remember the date of the meeting. Although the minutes indi-

cate that he knew of the contract's execution at least by the November 27 meeting, Pomponio believes that he did not know about the contract at that time.[26] The minutes of the December 10, 1973 Executive Committee meeting are not before the Court, but if the minutes of the January 14, 1974 Executive Committee meeting are correct, this was the only meeting of the Executive Committee held in December.[27] There is no indication in the minutes of January 14 that the Lexington construction contract was discussed at that meeting, and the January 14, 1974 meeting was the last meeting prior to the February 5 meeting of the Committee, at which time the Lexington *loan* contract was approved. Though it is impossible to accurately determine, with any degree of certainty, the exact date that Pomponio reported to the Committee, it obviously occurred sometime in October, November or December, 1973. It is not necessary to do so, however, in light of Arthur Pomponio's further testimony.

Pomponio's reaction at the meeting following the disclosure, by John Rutledge, of the contract's execution was to articulate once again the reasons why the Trust should not build a hotel there.[28] Upon fur-

---

**24.** Pomponio testified that he did not recall ever attending a meeting at which time the construction contract was approved before he went to Lexington:

"I was never at a meeting where it was approved, that is, before I went to Lexington. But after my report came in, which had to be in either the latter part of November or December, it was approved." (PD at 61)

Pomponio also stated in response to a question asking him if there was a vote taken on the "Lexington hotel contract, the entry into the contract with a C. E. Pennington for the construction of the Lexington Hotel":

". . . I don't know whether it was in that meeting or a subsequent one, but we voted to give it to the low bidder, who is nationally recognized as a capable, qualified bidder." (PD at 40)

**25.** He also maintained erroneously at one point that the language of the minutes of September 10 and September 24 referred to excavation bids, but he later reversed his position after being shown additional information and stated that the language referred to the construction bids. (At the time of the September meetings, excavation work was well under way pursuant

to a contract entered into by the Trust in July, 1973.)

**26.** But according to the rough notes taken by Harding, Pomponio did know the contract had been signed at that time, and wanted to know why it was on the agenda.

**27.** Minutes are normally approved at the *next* meeting of the Executive Committee. The minutes of January 14, 1974 show that the minutes of the December 10, 1973 Executive Committee were approved at that time.

**28.** "Q. Do you recall what your reaction was? What did you say?

A. I recall my articulation on strengthening my objections as to why we should build a hotel there. And I don't recall dwelling on a contract because I still felt in my mind that if it were true there was no material, there was no construction other than a perfect hole that we could negotiate out without any damage to the Trust. And I recall making that suggestion, that if Tom, in fact, had signed a contract, that we should immediately negotiate with the contractor to abrogate the contract." (PD at p. 46)

ther questioning, Pomponio stated that he indicated no dissatisfaction with Broyhill's execution of the Lexington construction contract because he was told that Broyhill had been given authority to proceed by the Trustees:

"Q. Do you recall whether at this meeting you indicated any dissatisfaction with Tom Broyhill?

A. I was told that they had given Tom authority to proceed.

Q. Who told you that, do you recall?

A. As I recall, all the fellows said, 'Well, you haven't been here and you haven't been privy to all of our discussions, and we respect your judgment, and since you were so vehement about this particular hotel, we delayed everything for you to investigate, and we did further investigate.' And as I told you, Lee Potter investigated the financial ability of Lexington to pay off bonds. And they said, 'We have recommended to Tom to go right ahead with it,' you know." (PD at p. 47)[29]

According to Pomponio, the final vote was taken in order to formally ratify the actions taken by Broyhill and informally authorized by the Trustees:

"Q. What was approved at this point?

A. The construction contract and all the actions that Tom had taken.

Q. Do you recall, then, at that time were you ratifying the action that Mr. Broyhill had taken, that is, ratifying that he had already entered into the contract?

A. I am sure it was ratifying his actions." (PD at p. 62)

In further clarifying what was ratified at the meeting, Pomponio testified in his deposition:

"... [I] again vented my dissatisfaction with Lexington. But, as I recall it, the rest of the trustees had told me at that meeting that they had given Tom authority to proceed and negotiate everything that was necessary to get Lexington going.

Q. Do you recall that all the trustees said that or one of them or did you learn at that meeting?

A. I know this is what I was told, so that in order the records be straight again, they again reaffirmed and ratified Tom's actions." (PD at p. 63)

At the February 5, 1974 meeting of the Executive Committee, Pomponio, in order to make the vote unanimous, voted in favor of approving the construction loan that Broyhill had arranged.

Pomponio's testimony substantially supports the finding of the Court that Broyhill received informal authority to proceed with the execution of the construction contract with the low bidder on the project, and that all his actions were subsequently ratified by the Trustees in order to "keep the record straight." Pomponio was expressly told by the *other* Trustees that they informally authorized Broyhill to proceed. Pomponio's failure to object to Broyhill's "unauthorized" execution of the contract, either at a Trustee or Executive Committee meeting, or to Broyhill personally provides additional support for the premise that Broyhill possessed prior authorization. The Court views his failure all the more significant in light of his long history of objection to the

---

**29.** This Court is unable to locate the series of meetings that Pomponio ostensibly missed. According to the minutes of the Executive Committee, he was present at the meetings of September 10, September 24, October 22, November 12, November 27, 1973 and January 14, 1974. The only meeting that he was absent from was the October 9, 1973 meeting. The Court is unable to determine whether he was present at the December 10 meeting because no minutes of the meeting were introduced into evidence. As indicated earlier, the SEC failed

to clear the confusion surrounding these dates, and the Court will not attempt to do what the plaintiff had the burden of showing.

Pomponio, however, stated that in the discussion before a final vote on the Lexington contract he was the only dissenter, although he believes Brakefield, a consultant for the Trust, was wavering in his support of the project. *See* PD at p. 36. Brakefield, however, was not present at the November 27 meeting so the formal vote either took place earlier or at the December 10, 1973 meeting.

project and his attempt at the same meeting to extricate the Trust from the project before a construction loan was signed. In addition, importance attaches to the fact that no other Trustee disapproved or objected at any meeting to Broyhill's execution of the contract.

The testimony of Carl Hengen, another Trustee and member of the Executive Committee, also supports the finding. He testified that he believed that the Trustees gave Broyhill authority to negotiate the construction contract, and that his actions were subsequently ratified by the Board.[30]

Finally, it should be noted that Irwin Lee Potter, Arthur Pomponio and Randolph Rouse all signed the March 12, 1974 prospectus which stated only that the Lexington construction contract was executed on October 30, 1973. All three reviewed the prospectus in detail with the Trust's attorney, Mr. Scibelli, and none made any suggestions that the language regarding the Lexington hotel contract was incomplete or inaccurate, or that the language should reflect the fact that Broyhill had no authorization to execute the contract. On the contrary, all three were satisfied that the attorney had adequately prepared it.

### The Indemnification Agreements

In 1971 ART, DeLuca and Joel Broyhill initiated negotiations for the development of property located on Arlington Ridge Road in Arlington, Virginia. Subsequently, DeLuca and Joel Broyhill, as a joint partnership entitled Arlington Ridge Road Associates, entered into an agreement with ART to build a condominium on the property owned by the Trust in Arlington and which also provided that ART would supply all the necessary financing.[31] ART agreed to advance the capital necessary to build the condominium and it was further agreed that neither Joel Broyhill nor DeLuca would have to furnish any money for construction and development of the condominium, now known as "The Representative," nor would they be liable on any of the loans that were obtained. DeLuca and Joel Broyhill appeared before the Board of Trustees of ART in November, 1973 before the agreement was signed and fully discussed the conditions of their approval.[32] The Board agreed they should assume no personal liability on the loans. The only responsibility of ARR was to build the condominium and market it properly. In consideration for the above, ART was to receive profits anticipated to amount to approximately $1 million from the sale of the condominium in the sum of $5,000 per unit; ART was also to be paid 4% over prime interest rate on the loans, and in addition, was to receive $600,000 for the land.[33]

ART issued a commitment to lend ARR $10.8 million for construction of the condominium and work began on the project in September of 1973. A few months later ART began to experience difficulty in funding its loan commitment to ARR and entered into negotiations with Chase Manhattan Mortgage for its participation in the funding of the project. ART, ARR and Chase Manhattan executed a co-lending building agreement (see Pt. Ex. # 22) on February 25, 1974 that called for Chase Manhattan to lend ARR $10 million for the

---

**30.** *See* TR at p. 528. Hengen, however, could not remember when the authority was given, nor could he remember when Broyhill's actions were ratified. In light of the confusion surrounding these dates on the part of practically everyone, that by itself is not surprising.

**31.** The loan commitment contract entered into between ARR and ART was previously described in general terms under the heading "The $368,000 Loan Transaction."

**32.** That they not be required to put up any capital nor be personally liable on any of the loans.

**33.** Although ART was to continue to own the underlying land, the condominium was to be owned by ARR because ART would be unable to maintain its status as a REIT under the Internal Revenue Code if it owned the condominium and sold the units therein.

Even though DeLuca and Joel Broyhill were to contribute no capital for the project, the arrangements were quite favorable to ART. As outlined above, the Trust had no responsibility for the actual building, and was to receive approximately $1,000,000 on a first out basis on the sale of the condominium units, plus approximately 12% interest on any loans.

project. ART agreed to fund any remaining costs, and it was anticipated at that time that such costs would amount to approximately $2.5 to 3.2 million.[34]

ART, ARR and Chase Manhattan also executed a guaranty agreement whereby both ARR and ART unconditionally guaranteed due performance and payment under the terms of the note. The agreement was signed by Tom Broyhill and Arthur Pomponio for ART, and was also signed by both Joel Broyhill and his wife and John DeLuca and his wife for ARR. Therefore, both Joel Broyhill and DeLuca, along with their wives, were personally responsible under the terms of the guaranty agreement. The original agreement between ART and ARR, however, provided that Joel Broyhill and John DeLuca would incur no personal liability in the condominium construction project. ARR was advised by Chase Manhattan before the lending agreement was signed that their guaranty of the note was essential to Chase's participation in the project. Joel Broyhill and DeLuca naturally wanted assurances that their original agreement with ART limiting their personal liability would be honored. As a result, Broyhill, on behalf of ART on February 20, 1974, entered into an agreement prepared by counsel for ARR whereby it was agreed that ART would indemnify Joel Broyhill and DeLuca or their wives for any liability incurred as a result of their guarantees to Chase Manhattan Mortgage Trust.[35] It is apparent that Broyhill did not formally present the indemnification agreement to the Board of Trustees for their prior ap-

proval, nor did he expressly inform them of its existence after it had been executed.[36]

Since August, 1974, ART has been unable to fund its part of the loan commitment, and now contends that the indemnification agreement is null and void.[37]

Plaintiff contends that Broyhill had no authority to enter into the indemnification agreement[38] while defendants claim that Broyhill possessed such authorization, or at a minimum, had inherent authority under the powers granted him in the Declaration of Trust to execute such an agreement on behalf of the Trust. The SEC further asserts that ART failed to disclose in the March 12, 1974 prospectus, the Annual Report on Form 10–K for the year ending 1974, and the proxy statement dated March 14, 1975 that Broyhill executed the February 20, 1974 agreement without the knowledge or authorization of the Board of Trustees or the Executive Committee. The Court need not determine if Broyhill had general authority under the terms of Section 8.5 of the Declaration of Trust, see footnote 10, *supra*, because it finds that Broyhill was given authority from the Trustees to enter into the indemnification agreement.

John DeLuca testified that the indemnification agreement was entered into in order to live up to the original understanding that he and Joel Broyhill were to incur no personal liability on any funding of the condominium project, and would not be required to contribute any capital to the construction project. In fact DeLuca stated that he

34. The loan with Chase Manhattan Mortgage was for approximately $12,500,000. Chase was to lend the first $10 million and ART agreed to furnish the remaining $2,500,000, which was considered enough at that time to cover all foreseeable costs of construction. Approximately $1.3 million of ART's share of $2,500,000 had already been loaned to ARR on an unsecured basis pursuant to its prior commitment.

35. According to John DeLuca's testimony, there was nothing unusual about the indemnification agreement. The Trust was receiving excellent benefits and as a result was properly assigned the risks which DeLuca made clear

from the outset he would not assume personally.

36. While this failure to communicate may not be consistent with good business practices, this Court need not make any judgment on that because it does not, standing alone, constitute any violation of the federal securities laws.

37. Counsel for ART, however, are not as sure. In any case, the relative merits of such a position are of no importance to this proceeding.

38. Plaintiff does not contend that the guaranty agreement with Chase Manhattan (see Pt. Ex. # 23) was not approved or authorized by the Board of Trustees.

never would have entered into the loan agreement and guaranty agreement with Chase Manhattan if the indemnification agreement had not already been signed.

Although two trustees [39] state that they never saw the indemnification agreement and one trustee said that he never approved any such agreement,[40] the entire Board was briefed by DeLuca personally of the conditions of his and Joel Broyhill's participation in the project; namely, that they not be required to provide any capital, and that they incur no personal liability for any financing of the project. Although the discussion was related to the original loan agreement between ARR and ART, the Court believes Broyhill was reasonable in assuming that he had at least implied authority to maintain the initial understanding when the project was refinanced at that later date, barring some expressed directions to the contrary from the Board of Trustees or the Executive Committee. Furthermore, the Executive Committee on October 9, 1973, in a formal resolution (see Def. Ex. # 2) not included in the official minutes of the meeting but which has not been disputed by the plaintiff, authorized Broyhill and Arthur Pomponio to execute a lease on the property and to arrange a construction loan. In addition, the resolution stated:

"Thomas J. Broyhill and Arthur R. Pomponio are hereby further authorized and empowered to execute such other instruments and to take such other actions as may be necessary or advisable in connection with entry of ART into said agreements." (Def. Ex. # 2) [41]

"RESOLVED: That Thomas J. Broyhill, on behalf of himself as Trustee and on behalf of all the other Trustees and shareholders of American Realty Trust, and in his respective capacity as President of the Trust, is hereby authorized to execute on behalf of this Trust any and all documents, including assignments, guaranty agreements, transfers, loans, documents, and other agreements necessary to effectuate and complete the participation of American Realty Trust with the Chase Manhattan Mortgage and Realty Trust in a construction loan in an amount not to exceed thirteen million two hundred thousand dollars and to be secured on premises known as 1101 South Arlington Ridge Road, Arlington Virginia, containing approximately 3.77 acres.

Thomas J. Broyhill is hereby further authorized and empowered to execute such other instruments and to take such other actions as may be necessary or advisable in connection with the entry by American Realty Trust into said agreements."

In addition, the Trustees approved another resolution at the same special meeting of the Board granting similar authority to both Arthur Pomponio and Thomas Broyhill. These resolutions gave Broyhill broad authority to make such arrangements as he deemed advisable to effectuate the Chase construction loan agreement. In light of DeLuca's refusal to sign the Guaranty Agreement without assurances that he would incur no personal liability per the original arrangement, it was reasonable for Broyhill to sign an indemnification agreement on behalf of the Trust with Joel Broyhill and John DeLuca. The fact that Broyhill did not bring back every document to the Executive Committee for their scrutiny and subsequent approval does not make the actions unauthor-

**39.** Rouse (TR at p. 324) and Cooper (CD at pp. 99–101) testified that they had never been shown the documents.

**40.** Potter testified that he never approved such an agreement, but as the defendants pointed out, he never stated that the Board of Trustees approve or authorize such an agreement at one time or another.

**41.** Furthermore, the official minutes of the Executive Committee held January 14, 1974 show approval of the following resolution:

"RESOLVED: That Thomas J. Broyhill, on behalf of himself as Trustee and on behalf of all the other Trustees and shareholders of American Realty Trust, and in his respective capacity as President of the Trust, is hereby authorized to execute on behalf of this Trust any and all documents, including assignments, transfers, loans, documents and other agreements necessary to effectuate and complete the participation of American Realty Trust with the Chase Manhattan Mortgage and Realty Trust in a construction loan in an amount not to exceed 13 million dollars ($13,000,000.) and to be secured on premises known as 1101 South Arlington Ridge Road, Arlington, Virginia, containing approximately 3.77 acres.

FURTHER RESOLVED: That Thomas J. Broyhill is hereby further authorized and empowered to execute such other instruments and to take such other actions as may be necessary or advisable in connection with the entry by American Realty Trust into said agreements."

And, a certified copy of an extract from the minutes of a special meeting of the Executive Committee of the Board of Trustees held on February 26 states:

The fact that Trustees were not aware of these specific agreements does not imply that Broyhill was unauthorized to execute them. Several Trustees professed ignorance of the guaranty agreement with Chase, yet the SEC makes no claim that the agreement entered into by Broyhill was unauthorized. It follows that all the documents associated with the Chase Manhattan loan were not closely scrutinized after their execution by the Board of Trustees. There is nothing unusual per se in that arrangement.

■ In addition, plaintiff contends and defendants admit that the guaranty agreement with Chase Manhattan (Pt. Ex. # 23) and the indemnity agreement between ARR and ART were not disclosed in ART"s March 12, 1974 prospectus. The prospectus states that:

"The Trust issued a construction loan commitment to Arlington Ridge Road Associates Limited Partnership in the amount of $12,500,000 relative to the construction of the condominium project, which loan would be secured by a first lien on the leasehold interest. On February 26, 1974, this commitment was increased to $13,200,000. The Chase Manhattan Mortgage and Realty Trust has agreed to participate in the construction loan to the extent of $10,000,000 on the condition that the Trust lend all additional funds necessary to complete the project. Based upon estimates prepared by Chase Manhattan Mortgage and Realty Trust, the project cost, based upon present price levels, will be approximately $13,200,000. There exists the possibility that if the cost of the project exceeds the estimate that the Trust may have to lend additional funds to the Partnership to complete the project." (Pt. Ex. # 2)

The Court concludes that the prospectus did fail to disclose such agreements and that the facts omitted were material in that they would have been important to the average investor. The Court also finds no reference

to the February 20, 1974, and February 25, 1974 agreements in the Proxy Statement dated March 14, 1975.

Plaintiff further argues that the Annual Report on Form 10–K for the year ended September 30, 1974 failed to mention the indemnification agreement. Defendants do disclose the guaranty agreement of February 25, 1974, in the 1974 report on page three, note three of cites to the financial statements:

"On February 25, 1974, the Trust entered into a co-lending building loan agreement with another lending institution to fund $3,200,000 of a $13,200,000 construction loan to Arlington Ridge Road Associates. Additionally, the Trust has agreed to loan 'Ridge Road' any or all funds in excess of the $13,200,000 construction loan necessary for completion. The Trust has also unconditionally guaranteed the due performance and prompt payment of all of the borrower's obligations under the building loan agreement and the related note and mortgage."

Defendants contend that contingent liability is the same under both agreements, the indemnification agreement and the guaranty agreement. The Court is inclined to agree in so far as ART is concerned. Certainly, it is not the same with respect to Joel Broyhill and John DeLuca. But ART made no attempt to mislead the public by including their names as individuals also guarantying the performance and prompt payment of all the various obligations. Under these agreements ART is contingently liable for the entire amount, and the footnote adequately states that, even though not spelling out the precise agreements. The Court therefore finds that the 1974 report did not contain false or misleading statements or omissions regarding the Chase Manhattan loan.

The Annual Report on Form 10–K for the year ended September 30, 1975 discloses that:

---

ized. Plaintiff introduced no evidence showing that it was the will of the Trustees to examine each loan document before Broyhill is authoriz-

ed to execute them on behalf of the Trust, or for that matter, to scrutinize them after the arrangements are finalized.

"By agreement dated February 20, 1974, the Trust, among other things, agreed to loan to ARR funds necessary to complete the construction of the condominium project in excess of funds provided in the construction loan and to indemnify and save harmless the general partners of ARR from any and all personal losses and/or liabilities incurred in the construction of the condominium and to indemnify said partners from any and all losses and/or liabilities incurred on loan payment deficiencies suffered as a result of the sale of the condominium units. In addition, the Trust agreed to indemnify and save harmless the title insurance company, insuring the aforementioned construction loan, from any and all mechanics' liens that may be proven against the project. As part of the agreement to indemnify the general partners, the Trust agreed to take title to the property in the event it becomes necessary in order to prevent personal liability being asserted against the general partners."

The Court finds that this statement is not misleading, and that it adequately sets out the salient points an average investor would attach significance to.

### The Kincheloe Loan

█ On February 25, 1973 Paul C. Kincheloe, Jr. (Kincheloe) and his wife, Linda, Sandra B. Aman and her husband, Herbert L. Aman, III, entered into a joint venture through an indemnification and trustee agreement for the purpose of acquiring and developing a tract of land in Prince William County, Virginia, known as "Rollingwood." The agreement specified that the Kincheloes would proceed to secure a loan on the property and that title to the property would be taken in the name of Paul C. Kincheloe. Sandra Aman and her husband agreed that they would be responsible for one-half of all the financial obligations incurred in connection with the transaction. Paul and Linda Kincheloe were to become one-half beneficial owners of the property and Sandra Aman would be the beneficial owner of the remaining half of the property. Herbert Aman further agreed to guarantee the payment of any of the one-half liabilities that Sandra Aman was responsible for. Hersand Builders, whose officers consisted in part of Sandra and Herbert Aman,[42] was chosen to contract in writing for the purchase of the building. Sandra Aman is the daughter of Thomas Broyhill.

Kincheloe subsequently applied to ART for a loan and spoke with Tom Broyhill about arranging it. Although the sales contract between Hersand Builders, Inc. and the seller of the property was attached to the formal loan request of Kincheloe to Broyhill dated March 22, 1973, Kincheloe testified that he never presented a copy of the indemnification and trust agreement to Tom Broyhill and never mentioned it to him. Sandra and Herbert Aman's signatures are on the sales contract, but Kincheloe expressly states in his letter to Broyhill that "[A]lthough my name does not appear as purchaser on this contract, *I am the beneficiary of same and will be the record owner* and borrower from your company." (emphasis added)

Kincheloe also attached to his loan application statements of his net worth showing assets of approximately two million dollars. The loan agreement for $1.2 million was executed by Kincheloe and his wife and Tom Broyhill, representing ART. The loan was secured by the property, and both Kincheloe and his wife guaranteed payment of the loan. As of the date of trial, both Kincheloe and his wife were still subject to personal liability under the loan agreement. Neither Sandra nor Herbert Aman's name appeared on the face of the loan agreement executed by ART. In addition, Broyhill testified in his deposition that he did not ask who Kincheloe's partners were before making the loan because both Kincheloes were personally liable under the loan agreement.[43]

---

**42.** Herbert Aman is the President and Sandra Aman serves as Secretary of Hersand Builders, Inc.

**43.** Broyhill stated that "(because the Kincheloes personally guaranteed repayment of the loan) I didn't care if Joe McCarthy was the partner." BD at 402.

During the remainder of 1973 and 1974 Kincheloe and Broyhill met on several occasions to discuss the development of the Rollingwood property. Chester Hardy testified that Herbert Aman attended some of these meetings with Broyhill for varying lengths of time. He has no knowledge, however, of any of the conversations that took place, and Kincheloe testified that he never mentioned the role of Herbert Aman in the project and Broyhill never asked. Broyhill testified that Aman and he were good friends and that it was not abnormal for Aman to be privy to business discussions that Broyhill had in his office.

On December 18, 1973 Kincheloe sent a letter to Broyhill requesting that the Trust pay a bill addressed to Herbert Aman for expenses incurred in the development of the Rollingwood property. The bill was for expenses incurred by the certified land surveyor of the property, John F. Schiller. Pursuant to prior arrangement, Kincheloe forwarded the invoices to ART for reimbursement. Because reimbursement was not made promptly on this occasion, Kincheloe sent another letter to Broyhill on January 24, 1974 reminding him of the bill. He enclosed with his letter a personal note to Broyhill from Herbert Aman requesting payment of the enclosed bill and another copy of the invoice. The note, however, was written on the copy of the bill and Kincheloe made no mention of it in his cover letter. Nor did he mention Herbert Aman's name in his original letter of December 18, 1973. Broyhill never inquired of Kincheloe why he was sending bills addressed to Herbert Aman to the Trust for payment. Broyhill testified, though, that he rarely perused the bills received by the Trust but rather simply signed checks in payment of bills as submitted by his secretary.

In 1975 Kincheloe requested and received an extension from ART on the maturity date of the Rollingwood loan originally due May 30, 1975 until May 30, 1976.

The SEC contends that the loan was executed by Broyhill in violation of an expressed policy of ART not to lend any money to relatives. The policy of ART is set forth in the March 1974 prospectus on page 47, under the title "Permissible Transaction with Management":

> "[T]he Trust is not permitted to lend any assets or property of the Trust to . . any Trustee, any officer or employee of the Trust . . . or any affiliate of any of the foregoing persons, except that the Trust is permitted, if such transaction has been approved by the affirmative vote of a majority of the Trustees not so affiliated. . . ."

The Declaration of Trust does not define the term "affiliate", but Rule 405 under the Securities Act, 17 C.F.R. 230.405(a), and Rule 12b–2 under the Exchange Act, 17 C.F.R. 240.12b–2, which defines terms used in the Exchange Act and rules and regulations enacted thereunder define affiliate as follows:

> "An affiliate of, or a person affiliated with, a specified person, is a person that directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified."

Defendants contend there is no evidence that defendant Broyhill "controls, is controlled by or is under common control with his married daughter." Plaintiff counters that two Trustees testified that it was their belief that loans to relatives were prohibited. However, no written provision expressly states that policy.

Whether married daughters are included within the scope of the term "affiliate" need not be determinative, because the Court finds that Broyhill had no knowledge of his daughter's interest in the property at the time the loan was arranged.

Although there were numerous opportunities for Broyhill to discover Herbert Aman's participation in the Rollingwood project,[44] Kincheloe testified that he never

44. There is no direct evidence, however, that Broyhill was actually informed or had actual knowledge of Herbert Aman's participation as part of Hersand Builders, Inc. which in any case was not a part of the actual loan agreement. There were, however, numerous opportunities. The sales contract attached to the loan request contained the signature of Herbert

told Broyhill about Sandra Aman's interest and that Broyhill was genuinely surprised to later learn of her interest in the property. The testimony on this point is undisputed because neither Broyhill nor Sandra Aman was called to testify by the plaintiff. Mere knowledge of Herbert Aman's participation does not violate the terms of the policy, even if it is construed to include married daughters,[45] which is by no means clear. Kincheloe and his wife were the only two who signed the loan document except for ART, and both personally guaranteed the repayment of the loan.

The March 12, 1974 prospectus, the Annual Report of Form 10–K for the year ending September 30, 1974, and the proxy statement of March 14, 1974 do not disclose Sandra Aman's interest in the Rollingwood property and in the loan.[46] The Annual Report filed on February 5, 1976 for the year ended September 30, 1975 discloses that "[I]n January 1976, the Trust was informed that a previously undisclosed investor in a property on which the Trust holds two junior mortgages for a married daughter of the President and Chairman of the Trust." (Pt. Ex. # 5, at p. F–31)

Plaintiff charges that the above documents failed to disclose the interest of the Amans in the loan and that Broyhill failed to disclose these facts to the Board of Trustees when they approved the loan and subsequent extension as required by law.

Certainly, however, Broyhill or the Trust could not report what they had no knowledge of. The Court has already found that Broyhill had no knowledge of his daughter's interest in the property at the time the loan was executed. According to the testimony of Kincheloe, Broyhill at a much later date, inquired of his daughter's participation and was surprised to learn of her interest.[47] Kincheloe does not mention an exact date, and the SEC has failed to prove that he actually learned of her interest before the date indicated in the 1975 report, when the Trustees were informed of her interest. Accordingly, Broyhill did not fail to disclose material information in his possession regarding the loan that was required by law.

## CONCLUSIONS OF LAW

The Court concludes that it has subject matter jurisdiction over the present action, 15 U.S.C. § 77v(a), 78aa, and the plaintiff Commission has standing to maintain the instant action. 15 U.S.C. § 77t(b).

*Alleged Violations of Antifraud Provisions*

Plaintiff asserts that defendants violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)[1] and 10(b) of the Securities

Aman. The bill submitted by Paul Kincheloe was invoiced to Herbert Aman, and Aman enclosed a personal note on one copy. In addition, Aman was present for at least part of some of the discussions between Kincheloe and Broyhill about the loan. Finally, Kincheloe and Herbert Aman had past business dealings which Broyhill knew about. Kincheloe testified, however, that to his knowledge, Broyhill was not aware at any time of the indemnification agreement.

**45.** Although Sandra Aman had an undisclosed interest in the property securing the loan, Herbert Aman was not a party to the loan.

**46.** The March 1974 prospectus and the 1974 Report disclosed that the Kincheloe loan was a junior mortgage for $1,200,000 at 14% interest for land in Prince William County, Virginia made by ART. *See* Pt. Ex. # 2, at p. 82. The proxy statement contained no information on the subject.

The 1974 Report further discloses that ART's junior mortgages on the property for $1,389,-248 are classified as nonearning.

**47.** Kincheloe testified that after the law suit was filed, Kincheloe and Broyhill discussed the Amans' participation in the Rollingwood property and that Broyhill told him that he was "not aware that Sandra had any interest in the property, as the partnership or venture agreement states." TR at 344.

**1.** § 17(a) reads as follows:

*Fraudulent Interstate Transactions*

Sec. 17.(a) It shall be unlawful for any person in the offer or sale or any securities by the use of any means of instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made,

and Exchange Act of 1934, 15 U.S.C. § 78j(b)[2] and Rule 10b–5[3] promulgated thereunder, by their actions in the five transactions described, *supra.*

Said Acts and Rule impose upon persons engaged in the sale of securities a duty of full disclosure and the intentional failure to disclose any material fact in relation thereto constitutes a violation of the provisions. More specifically they make it unlawful for any person in connection with the offer or sale or purchase of any security to make the statements made, in the light of the circumstances under which they were made, misleading, or to engage in any act, practice or course of business which operates as a fraud or deception upon any purchaser of any security.

■ The basic test for materiality of misrepresentation or omission relied on in an action for fraud in violation of the Securities Act of 1933 and the Securities and Exchange Act of 1934 is whether a reasonable and prudent investor would attach importance to the facts or fact omitted or misrepresented in determining his choice of action in the transaction in question. Cf. *SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 849 (2 Cir.), *cert. denied, Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *See generally Affiliated UTE Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Mills v. Elec-*

*tric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

■ On the basis of the facts found relating to the $368,000 loan, bogus vouchers, Lexington Hotel contract and Kincheloe loan transactions, the Court concludes that there were no material omission or misstatements in the 1974 prospectus. Consequently, the Court holds that defendants committed no violations of the antifraud provisions with respect to these transactions.

The Court, however, has already found that the defendants made a material omission by failing to include in the March 12, 1974 prospectus all the material facts relating to the Chase Manhattan loan arrangement. Though the omission was material, the Court nevertheless finds that defendants did not violate the antifraud provisions of the 1933 or 1934 acts because the plaintiff has failed to prove the requisite level of culpability.

Although many previous opinions have held that mere negligence will suffice, e. g., *SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2 Cir. 1975); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2 Cir. 1972); *SEC v. Texas Gulf Sulphur, supra*, at 854–55, the Supreme Court recently held in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)

---

in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**2.** § 10(b) states in full:
*Regulation of the Use of Manipulative and Deceptive Devices*
Sec. 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
\* \* \* \* \* \*
(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulation as the Commission may prescribe as necessary or appro-

priate in the public interest or for the protection of investors.

**3.** *Rule 10b–5. Employment of Manipulative and Deceptive Devices*
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange.
(1) to employ any device, scheme, or artifice to defraud,
(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase sale of any security.

that scienter must be plead and proved in private actions under the Exchange Act's antifraud provisions. In so holding, the Supreme Court found the language and history of 10(b) and Rule 10b–5 dispositive.[4]

If the language and history of 10(b) is dispositive as to a scienter requirement in private actions, it must also be so for SEC enforcement actions, since such suits are creatures of statute rather than implied rights of action. Only policy considerations which have traditionally been applied to distinguish the two kinds of cases, see *Texas Gulf Sulphur, supra,* at 868. (Friendly, C. J. concurring), could support a contrary result, but the Supreme Court in *Hochfelder* found no reason to even examine such considerations, since in its opinion the language and history of the Act were dispositive.[5] The District Court in *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226 (S.D.N.Y. 1976) so reasoned when it held that scienter is a necessary element in an action for injunctive relief under Section 10(b) and Rule 10b–5 of the Securities and Exchange Act.

Both antifraud provisions—§ 10(b) of the 1934 Act, and § 17 of the 1933 Act—contain almost identical language,[6] a fact which even the SEC has admitted. See plaintiff's brief at p. 20. Both provisions have similar purposes.[7] Accordingly, the Court concludes that scienter—an intent to deceive, manipulate, or defraud[8]—is also a necessary element in an action for injunctive relief brought by the SEC pursuant to § 17(a) of the Securities Act of 1933.[9]

A careful examination of the record in this case leads the Court to conclude that defendants did not possess the requisite intent to deceive, manipulate or defraud. The SEC has established but one instance in which defendants made a material omission or misstatement in any of the

---

4. The Supreme Court held that § 10(b) is limited in private actions to willful and knowing acts and did not comprehend negligent misstatements or omissions.

 The Court refrained from discussing whether scienter would be required in SEC injunctive proceedings, but the dissenters argued that the Court would be unable to find, after this decision, an appropriate basis for distinguishing between the standards to be followed in SEC injunctive actions and private actions:

 "I see no real distinction between that situation and this one for surely the question whether negligent conduct violates the Rule should not depend upon the plaintiff's identity. If negligence is a violation factor when the SEC sues, it must be a violation factor when a private party sues. . . ." 425 U.S. at 217, 218, 96 S.Ct. at 1392.

5. For further support of the view that scienter should also be required in SEC enforcement actions brought pursuant to § 10(b), see Dan L. Goldwasser, *Ernst & Ernst v. Hochfelder; An Anti-Landmark Decision,* 22 N.Y.L.School L.Rev. 29, 48–49 (1976).

6. See Goldwasser, *supra,* at p. 30. ("Its language (10–b) largely follows that of section 17a of the Securities Act of 1933").

7. § 10(b), however, has a broader scope than § 17(a) of the 33 Act. The primary purpose of the 1933 Act was to correct abuses in the sale of new issues, and its antifraud provisions are accordingly aimed at the sale or offering of a security for value. The primary purpose of the 34 Act, however, was the regulation of securities after their distribution, and its antifraud provisions are necessarily broader in scope.

8. The Supreme Court in *Hochfelder* defined scienter as "a mental state embracing intent to deceive, manipulate or defraud," 425 U.S. at 193–194, n. 12, 96 S.Ct. at 1381, and emphasized that "the language of § 10(b) . . . so clearly connotes *intentional* misconduct." *Id.* at 201, 96 S.Ct. at 1384.

 It is clear that the Court intended there should be no liability for negligent misstatements or omissions, but because the plaintiff based his claim on negligence, the Court in *Hochfelder* did not decide whether the requisite level of culpability could be met by proof of reckless misconduct.

 The Supreme Court's emphasis that scienter means to deceive leads this Court to agree with the conclusion, reached by the District Court in *Bausch & Lomb, supra,* that "only what Judge Friendly has characterized as 'the kind of recklessness that is equivalent to willful fraud,' TGS, *supra* at 868, will serve as a basis for liability." *Id.* at n. 4.

 One decision subsequent to *Hochfelder; McLean v. Alexander,* 420 F.Supp. 1057 (D.Del. 1976), has indicated that knowing conduct is to be equated with scienter, but this Court declines to follow that decision.

9. *Cf.* A. Bromberg, *Securities Law: Fraud,* Sec. 814 (330), P. 204.23 (1973). *Contra, SEC v. World Radio Mission, Inc.,* 544 F.2d 535 (1 Cir. 1976).

documents subject to SEC regulation. The omission was corrected in the 1974 and 1975 reports filed on Form 10–K. Consequently, the Court finds that defendants Broyhill and ART did not violate the antifraud provisions of the 33 and 34 Acts, § 10(b) and Rule 10b–5 of the 34 Act, and 17(a) of the 33 Act.

### Alleged Violations of Proxy Provisions

Plaintiff also alleges defendants violated the federal proxy provisions, § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. 240.14a–9.

In *J. I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), the Court defined the objective of § 14(a) as follows:

"The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that 'fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.' H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13. It was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . (had) frustrated the free exercise of the voting rights of stockholders.'"

The Commission, in promulgating Rule 14a–9, has provided that no proxy solicitation shall be made that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . ."

Therefore, the definition of materiality sets the threshold for the imposition of liability under Rule 14a–9. The Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976), recently defined the general standard of materiality for Rule 14a–9 violations as follows:

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . What the standard contemplates is a showing of substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." [10]

In other words, said the Court, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Ibid.* The Court, however, declined to consider what showing of culpability is required under § 14(a) to establish the liability of a corporation issuing a materially misleading proxy statement, or of a person involved in the preparation of a materially misleading proxy statement. The Court need not consider that question, because it determines that the findings of fact relating to all the transactions save the one involving the Chase Manhattan loan do not support a conclusion that the many statements made in the proxy statement or any of the omissions claimed by the SEC to have been in violation of Rule 14–a were materially misleading as a matter of law. With respect to the Chase Manhattan transaction, the SEC admits that if sufficient disclosure was made in the 1974 10–K, subsequent disclosure in the proxy would not be necessary. The Court has found that the 1974 Report filed on Form 10–K was sufficient in relating the fact of contingent liability for the full amount on the Chase Manhattan loan to

---

**10.** In so holding, the Court overruled the definition of material fact adopted by the Court of Appeals in the case—"[a] fact which a reasonable shareholder *might* (emphasis added) consider important." The Court agreed with Judge Friendly's conclusion in *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1302 (2 Cir.

1973) that the "might" formulation is "too suggestive of mere possibility, however unlikely."

It should be noted that the *Northway* decision involved a private action, but this Court thinks the standard would be identical in a SEC enforcement action.

ARR. Accordingly, no violation on the part of either defendant of § 14(a) of the Exchange Act, and the rules promulgated thereunder, is found.

*Alleged Violations of Reporting Provisions*

 Plaintiff also alleges defendants violated § 13(a) of the Exchange Act, as amended, 15 U.S.C. § 78m(a),[11] Rule 13a–1, 17 C.F.R. 240.13(a)–1 [12] and Rule 12(b)–20, 17 C.F.R. 240.12b–2(a),[13] by filing or causing to be filed annual reports on Form 10–K for ART's fiscal year ending September 30, 1974 and ending September 30, 1975 which failed to fully disclose material transactions that were fraudulently omitted from the March 12, 1974 prospectus.

On the basis of the findings of facts, we conclude that the reports did not omit material information known to either Broyhill or ART which was necessary to make the "required statements, in the light of the circumstances under which they were made, not misleading." Rule 12b–20, *supra,* n. 13.

The Court has previously held that plaintiff failed to prove its allegations relating to the Kincheloe loan,[14] the $368,000 loan to VHM, the alleged bogus vouchers, and the Lexington Hotel construction contract. Therefore, the Court finds that with respect to those transactions, defendants did not violate the above cited reporting provisions.

The Court found, however, that the March 12, 1974 prospectus failed to disclose the fact that ART had incurred contingent liability of approximately $10 million in the loan arrangement with Chase Manhattan Mortgage. Although the 1974 report does not mention every specific agreement, i. e., the indemnification agreement between the ARR partners, Joel Broyhill and John De-Luca and ART, it clearly discloses the fact that ART had incurred contingent liability [15] and therefore, was not misleading.[16]

 Plaintiff also alleges that the auditor's certificate to the 1975 10–K report is defective because it fails to meet the requirements of Rule 2.02 of Regulation S–X. The defendants assert, however, that a number of the alleged deficiencies which resulted in the auditor failing to include an opinion regarding the financial statements covered by the report were beyond the control of the defendants. *See* Pt. Ex. # 5, pp. F1–F3. This Court agrees. Certainly, defendants cannot be expected to "predict" the outcome of an SEC investigation, nor predict whether debenture holders will demand immediate payment of outstanding sums. Accordingly, the Court concludes that defendants are not in violation of the auditing rules of the SEC.

11. 13(a) states:
 *Periodical and Other Reports*
 Section 13.(a) Every issuer of a security registered pursuant to section 12 of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

12. Rule 13a–1 provides in pertinent part:
 *Rule 13a–1. Requirement of Annual Reports*
 Every issuer having securities registered pursuant to Section 12 of the Act shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year. . . Annual reports shall be filed within the period specified in the appropriate form.

13. Rule 12b–20 reads as follows:
 *Rule 12b–20. Additional Information*
 In addition to the information expressly required to be included in a statement or report, there shall be added such further material in-

formation, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.

14. SEC failed to prove that either defendant knew that Broyhill's married daughter had an interest in the loan until the 1975 10–K was filed.

15. By the expressed terms of the guaranty agreement, both ARR's partners and ART guaranteed payment of the loan. *See* Pt. Ex. # 23. Section 3–416(1) of the UCC provides:
 " 'Payment guaranteed' or equivalent words added to a signature mean that the signor engages that if the instrument isn't paid when due he will pay according to its tenor without resort (emphasis added) by the holder to any other party."

16. The 1975 report fully discloses the existence of the indemnification agreement.

In addition plaintiff claims defendants violated Paragraph A of the General Instructions to Form 10–K, by failing to file the 1975 annual report on Form 10–K within 90 days after the end of the fiscal year covered by the reports. It is uncontroverted that ART's annual report was due December 29, 1975, but was not filed until February 5, 1976 and that ART's request for an extension of time was denied. The delay constitutes, at best, however, a minor technical violation of Rule 13a–1 which requires that the reports be filed within the period specified in the appropriate form. The SEC has failed to show any consistent pattern of delay on the part of ART in filing the required forms and reports and this Court therefore holds that defendants' delay on this occasion does not provide a basis for the injunctive relief prayed for by plaintiff, because it has failed to show a reasonable likelihood that ART will continue to file reports late in the future. *See* discussion under heading "Injunctive Relief." *Infra.*

## Injunctive Relief

On the basis of the alleged violations of ART and Broyhill of the antifraud, proxy, and reporting provisions of the federal securities laws, plaintiff requests an order permanently enjoining defendants from further violations of those provisions.[17]

■ Section 21(d) of the Exchange Act empowers the Commission to bring an action for injunctive relief when it appears that any person "is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions" of that Act or of any rule or regulation promulgated thereunder by the Commission. § 20(b) of the Securities Act

of 1933 corresponds in all material respects to § 21(e) of the Exchange Act. Under both statutes, a permanent or temporary injunction or a restraining order will be granted "upon a proper showing." Therefore, plaintiff need not show irreparable harm or injury but need only show that the statutory conditions have been satisfied. *See, e. g., SEC v. Arco Industries, Inc.,* CCH Fed.Sec.L.Rep. ¶ 92,921; ¶ 92,973 [1970–71 Transfer Binder] (S.D.N.Y.1971); *SEC v. First American Bank & Trust Co.,* 481 F.2d 673, 682 (8 Cir. 1973); *SEC v. Boren,* 283 F.2d 312 (2 Cir. 1960).

■ Since it is established that defendants have not committed any violations of the Securities Act of 1933 or Exchange Act of 1934 and rules promulgated thereunder, there is no basis for granting the injunctive relief requested by plaintiff. Even if the Court had found defendants in violation of the antifraud provisions of the 33 and 34 Acts for failing to include all the agreements relating to the Chase Manhattan loan, the Court would not be justified in issuing an injunction against the defendants on the evidence presented.

■ In determining whether to grant injunctive relief against further violations of the federal securities laws, courts try to seek and determine whether there is a likelihood of recurrence of unlawful activity and a need for a prophylactic against recidivism. A simple conclusion that illegal activity has occurred, without more, does not provide a proper basis for relief. *SEC v. Management Dynamics, Inc.,* 515 F.2d 801 (2 Cir. 1975); *SEC v. Keller Industries, Inc.,* 342 F.Supp. 654, 660 (S.D.N.Y.1972).[18] The standard is whether there is a "reasonable likelihood that the wrong (will) be repeated,"[19] *SEC v. Manor Nursing Centers,*

---

17. § 17(a) of the Securities Act, as amended, 15 U.S.C. § 77q(a) and § 10(b), 13(a) and 14(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78m(a) and 78n(a) and Rules 10b–5, 13a–1 and 14a–9 and Rule 12b–20, 17 C.F.R. 240.12b–20.

18. In *SEC v. Keller, Industries, supra,* at 660, the Court stated:

"The SEC concedes that it has the 'burden to present a strong prima-facie case of violations.' It may well have done so, but that is not

enough. There must also be a showing that there exists a 'reasonable expectation of further violations.' "

19. Although past illegal conduct is "highly suggestive of the likelihood of future violations, see, e. g., *SEC v. Manor Nursing Centers, Inc., supra; SEC v. Keller Corp.,* 323 F.2d 397, 402 (7 Cir. 1963), whether that inference is properly drawn depends on the totality of circumstances and factors suggesting that the infraction might

*Inc., supra,* at 1100 (2 Cir. 1972); *SEC v. Culpepper,* 270 F.2d 241 (2 Cir. 1959); *accord, Los Angeles Trust Deed & Mortgage Exchange v. SEC,* 285 F.2d 162, 180–181 (9 Cir.), *cert. denied,* 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961), as distinguished from the mere possibility of future violations on the part of the defendants.[20]

A court is vested with broad discretion in deciding whether to grant injunctive relief, which may be set aside only upon a clear showing of abuse of discretion. *U. S. v. W. T. Grant,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *SEC v. Manor Nursing Centers, Inc., supra,* at 1100; *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 394, 405–06 (2 Cir.), *cert. denied,* 414 U.S. 910, 924, 94 S.Ct. 231, 232, 234, 38 L.Ed.2d 148, 158 (1973); *SEC v. Pearson,* 426 F.2d 1339 (10 Cir. 1970); *SEC v. Culpepper, supra,* at 249–250 and *SEC v. Universal Service Ass'n,* 106 F.2d 232 (7 Cir.), *cert. denied,* 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519 (1939). A no less stringent standard of review applies when the appeal is from denial of injunctive relief. *Id.* at 405.[21]

The cessation of the illegal activity does not deprive the Court of its power to hear and decide the case, *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), nor does it preclude the issuance of an injunction. *SEC v. Dott,* 302 F.Supp. 169 (S.D.N.Y.1969). It is, however, a factor to be considered in determining whether a reasonable likelihood exists that the wrongs will be repeated in the future. *SEC v. Koracorp Industries, Inc.,* CCH Fed. Sec.L.Rep. ¶ 95,532 [1975–1976 Transfer Binder] (N.D.Cal., 3/26/76); *SEC v. Keller Industries, Inc., supra,* at 660. In *Koracorp,* the District Court refused to issue the injunction because the alleged violations had been halted and corrected and because there had been no violations within the last 18 months. Likewise, in this proceeding, even if defendants were guilty of a violation of the antifraud provisions as a result of their failure to disclose in the 1974 prospectus all the material facts surrounding the Chase Manhattan loan, such omissions were corrected in the 1974 and 1975 reports. The Court would on the basis of those findings conclude that there exists no reasonable likelihood of future violations and ac-

not have been an isolated occurrence are always relevant. *See SEC v. Harwyn Industries Corp.,* 326 F.Supp. 943, 951–58 (S.D.N.Y.1971).

**20.** Defendants argue that the standard should be whether there is a "Propensity or natural inclination to violate the securities laws", a test which was specifically rejected in *Manor, supra. But, see SEC v. Bangor Punta Corp.,* 331 F.Supp. 1154, 1163 (S.D.N.Y.1971), *aff'd sub nom. Chris-Craft Industries, Inc. v. Piper Aircraft,* 480 F.2d 341 (2 Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). The affirmance in *Bangor Punta* of the application of the "propensity" standard by the Second Circuit did in fact come at a later date than the affirmance in *Manor Nursing Centers, Inc., supra,* but this Court finds little difference between the two standards and is inclined to use the reasonable likelihood standard because it is most often cited. The statute expresses the applicable standard as "any person [who] engages or is about to engage in any acts or practices which constitute or will constitute a violation of the provisions" of the Act or any rule or regulation promulgated thereunder. As pointed out in the *Chris-Craft* opinion, *supra,* at 394, "the use of either test, if indeed they differ except in verbiage, is not the subject of immutable statutory command."

Although this Court sees little difference between the two, it could be argued that the reasonable likelihood standard is the more narrow of the two because it talks of a particular wrong. The Court in *Chris-Craft* further stated:

"Although there is some difference between the two clauses, both express substantially the fundamental condition precedent to the issuance of the extraordinary remedy of a permanent injunction, i. e., that there must be a showing of a cognizable risk of future violation, something 'more than the mere possibility which serves to keep the case alive.' *United States v. W. T. Grant,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953)." *Id.* at 405.

**21.** But see *SEC v. Advance Growth Capital Corp.,* 470 F.2d 40, 53 (7 Cir. 1972) where the Court said it "would not hesitate to reverse any order denying such relief when it is evident that the trial court's discretion has not been exercised to effectuate the manifest objectives of the specific legislation involved." This Court, however, is inclined to follow the language of the Second Circuit in *Chris-Craft, supra.*

cordingly, deny the injunctive relief requested by the SEC. Even though the "standards of public interest, not the requirements of private litigation measures the propriety and need for injunctive relief in these cases." *Hecht Co. v. Bowles, supra,* 321 U.S. at 331, 64 S.Ct. at 592, " a District Court is called upon to assess all the considerations of fairness that have been the traditional concern of equity courts." *SEC v. Manor Nursing Centers, Inc., supra,* at 1102. These principles must be weighed carefully even if there exists a "cognizable danger of recurrent violation as even that condition does not alone suffice to authorize an injunction." *SEC v. Keller Industries, supra,* at 660. Such concerns include the nature and extent of past violations, and the effect on the public interest. *Chris-Craft, supra,* at 406, citing *SEC v. Harwyn Industries Corp.,* 326 F.Supp. 943, 955–958 (S.D.N.Y. 1971). Furthermore, added the District Court in *Harwyn:*

> ". . . (W)e must not forget that the issuance of an injunction can sometimes have a harmful impact on the personal reputation and legitimate business activities of defendants, *SEC v. Broadwall Securities, Inc.,* 240 F.Supp. 962, 967 (S.D.N.Y.1965) ('the adverse effect of any injunction upon defendants is, of course, a factor to be considered . . .')." *Id.* at 957.

See also *SEC v. Arco Industries, Inc., supra.*

In assessing all these considerations, even if the single violation discussed *supra* in fact occurred, injunctive relief [22] would still be inappropriate. The SEC has failed to show that there exists a cognizable danger of recurrent violation, and therefore, has

failed to make a proper showing for injunctive relief. Accordingly, plaintiff's request for a permanent injunction is denied.

### Ancillary Relief

In addition to a permanent injunction enjoining defendants from future violations, plaintiff requests ancillary relief in the form of an order from the Court (1) removing Broyhill as an officer and trustee of ART, (2) appointing such additional trustees to the Board of Trustees of ART as the Court may deem appropriate, (3) directing ART to conduct a detailed review of the affairs and conditions of ART, and (4) commanding ART to comply with § 13(a) of the Exchange Act, as amended, 15 U.S.C. § 78m(a), and Rule 13a–1, thereunder, 17 C.F.R. 240.13a–1 by filing corrected annual reports on Form 10–K for ART's fiscal years ending September 30, 1974 and September 30, 1975.

■ Some of the earliest cases decided under these acts recognized the authority of the courts to grant ancillary relief. *See Deckert v. Independence Shares Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *Kardon v. National Gypsum Co.,* 73 F.Supp. 798 (E.D.Pa.1947). When necessary, it has been used as a tool to effectuate the grant of injunctive relief. *See, e. g., SEC v. Bowler,* 427 F.2d 190, 197 (4 Cir. 1970); *SEC v. Keller Corp.,* 323 F.2d 397 (7 Cir. 1963); *Chris-Craft Industries v. Piper Aircraft Corp., supra.* Section 22 of the 33 Act, 15 U.S.C. § 77v(a) and § 27 of the 34 Act, 15 U.S.C. § 78aa, confer general equity powers upon district courts. *SEC v. Texas Gulf Sulphur, supra,; SEC v. Manor Nursing Centers, Inc., supra.* [23] Therefore, once

---

**22.** In light of the expansive injunctive relief sought by the SEC in this action, the Court finds the concluding language in *SEC v. Koracorp Industries, Inc., supra,* at ¶ 95,532 particularly appropriate:

> "Despite SEC arguments to the contrary, what it seeks is more than a mere prophylactic related to the specific facts of the case. The broad all-encompassing injunction sought here against any conceivable future violations carries the strong inference that the Court believes that defendants *would* violate the law, but for the Court's intercession, an inference this Court believes to be too

heavy to place on these defendants on as inadequate a showing as has been made here."

**23.** "Once the equity jurisdiction of the District Court is properly invoked by a showing of securities violations, the Court possesses the necessary power to fashion an appropriate remedy." *Manor* at 1103. *See also Los Angeles Trust Deed & Mortgage Exchange v. SEC, supra,* at 182, where the Court stated:

> "[A]s the Supreme Court has stated with respect to other regulatory statutes, [we con-

a showing of violation has been made, the acts do not expressly limit the power to grant appropriate remedies.

■ Because no violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934 have been found, the Court is without jurisdiction to entertain the relief sought by the plaintiff. Again, even if the Court had found a violation of the antifraud provisions of both acts for defendants' material omission caused by their failure to disclose all the agreements relating to the Chase Manhattan loan arrangement, the Court would not be justified in granting the SEC's claim for ancillary relief.

■ Although a number of courts have appointed receivers under both acts in cases where the SEC established fraudulent misconduct and mismanagement,[24] *SEC v. Bowler, supra; SEC v. S & P National Corp.,* 360 F.2d 741 (2 Cir. 1966); *Los Angeles Trust Deed & Mortgage Exchange v. SEC, supra; Keller Industries, supra; SEC v. Bartlett,* 422 F.2d 475 (8 Cir. 1970). Plaintiff cites little authority supporting the issuance of the expansive relief Commission seeks in this action.[25] The relief asked for by the SEC would require the Court to replace the Chief Executive of ART and appoint new trustees without providing the protection of continuous supervision of this Court.[26] Even if the power existed, it would seem unwise under these facts to replace an incumbent President, appoint additional trustees to serve on the Board, and oversee the operation of the

---

clude with respect to § 20b of the Securities Act and by implication, § 21(e) of the Exchange Act] that the Congress must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of the statutory purposes."
*See generally J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 391, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

**24.** Nearly all the opinions, however, are consent decisions entered upon agreement of both parties. In addition, there are important differences between the appointment of receivers, and the replacement of officers of a company and the appointment of new trustees. Receivers are most frequently appointed in situations where the issuer was insolvent, *e. g., Los Angeles Trust Deed & Mortgage Exchange v. SEC, supra,* at 181; *SEC v. H. S. Simmons & Co.,* 190 F.Supp. 432 (S.D.N.Y.1961). In Robert J. Malley, *Far Reaching Equitable Remedies Under the Securities Acts and the Growth of Federal Corporate Law,* 17 Wm. & Mary L.Rev. 47, 51 (1975), it is stated:

"In each instance . . . the motivation underlying such an appointment was to preserve and maintain the status quo in order that necessary steps could be taken to provide relief to those who had been damaged or threatened with injury as a result of the defendant's unlawful activity."
Its primary responsibility, therefore, is to preserve the status quo by protecting corporate property or assets from waste or misappropriation. *See, e. g., SEC v. Charles Plohn & Co.,* 433 F.2d 376, 379 (2d Cir. 1970) (receiver appointed to oversee liquidation); *SEC v. Keller Corp.,* 323 F.2d 397, 403 (7th Cir. 1963). Re-

ceivers labor under the close supervision of the Court, but are ". . . expected to exercise all the powers and obligations inferred or directed by state law." *Court Appointed Directors: Ancillary Relief in Federal Securities Law Enforcement Actions,* 64 Geo.L.J. 73, 7, 742 (1976). In addition:
"Because of the obligations of court-appointed directors to participate actively in management functions, particularly with respect to decisions affecting equity interests, the remedy will affect the stockholder-management relationship to a much greater degree than does receivership." *Ibid.*

**25.** The Commission asserted in their brief:
"Since courts have power under federal securities laws to replace a corporation's entire management and board of directors with a receiver, a fortiori, this Court has authority to remove an officer or trustee."
Although appointment of a receiver is a traditional tool of equity courts, it constitutes a drastic remedy, which should be employed only as a last resort. *Cf. Mintzer v. Arthur L. Wright & Co.,* 263 F.2d 823 (3 Cir. 1959). Removal of an officer or appointment of new trustees, therefore, represents an even more drastic remedy because of the lack of protection afforded in its receivership situation by close court supervision. Nearly all cases granting such drastic relief are consent decisions. *See, e. g., SEC v. Mattel, Inc.,* CCH Sec.L.Rep. ¶ 94,754 [1974–1975 Transfer Binder] (D.D.C. 1974) (appointment of a majority of Boards of Directors); *SEC v. Vesco,* 72 Civ. 5061 (S.D. N.Y. 3/16/73) (appointment of directors coupled with mandatory resignation of existing management).

**26.** See discussion, *supra,* in footnote 24.

Trust. Such expansive authority should not be exercised except in the most extreme cases.

■ The relief sought here by the SEC, the appointment of trustees and removal of the President, infringe on activities traditionally controlled by the states. The federal securities laws are at best a limited federal corporate law and the SEC and federal courts are "bound to respect the limits which are inherent in a statutory scheme aimed at ensuring disclosure in the sale of securities and not the substantive regulation of business itself." *Equitable Remedies in SEC Actions,* 123 U.Pa.L.Rev. 118, 1216 (1976). Except in the most egregious cases, courts should not interfere with corporate democracy. Those circumstances are not present in the instant action.

■ Likewise, plaintiff's request for an order commanding defendants to file corrected copies of their 1974 and 1975 annual reports filed on Form 10–K is denied. The Court previously concluded there were no material omissions in the reports, nor were there any materially misleading statements included in the same. Plaintiff has authority under Section 15(c)(4) of the Exchange Act, 15 U.S.C. § 78o (c)(4) to issue an order requiring defendants to comply with any reporting provision they have failed to comply with, but has failed to exercise that grant of power to demand compliance on the part of the defendants with the reporting provisions.

### Admissibility of Deposition of Benjamin Cooper

■ In response to plaintiff's request near the end of their presentation of evidence at trial to introduce the deposition of Benjamin Cooper, this Court ruled that it could not be admitted because it was objected to by defendants. In a letter to the Court on May 21, 1976, plaintiff renewed its request for admission of Cooper's deposition. The Court at that time responded that it would rule on the issue along with all the other issues in the case at the same time, and suggested that both plaintiff and defendants cover the question in their briefs.

The Court has considered the arguments of both counsel and concludes that the deposition of Benjamin Cooper is admissible.[27] In accordance with the request of defendants, Cooper's entire deposition is hereby admitted into evidence.

On the basis of its Findings of Fact and Conclusions of Law, the Court holds that

---

**27.** A deposition of a witness, whether or not a party, may be used by any party for any purpose if the Court finds that any one of the conditions of Rule 32(a)(3), Fed.R.Civ.Pro. are met. In this case the Court finds that the deponent was at a greater distance than 100 miles from the place of trial and further finds that his absence was not procured by the party offering the deposition. Rule 32(a)(3)(B). As stated in 2a Barron & Holtzoff, *Federal Practice & Procedure* § 654, at p. 663:

"Unavailability of the deponent, as well as admissibility of a deposition is to be determined by the Court and depends generally upon the conditions which exist at the time it is offered."

*See generally Houser v. Snap-On Tools Corp.,* 202 F.Supp. 181 (D.Md.1962).

In addition, Cooper's deposition is admissible under Rule 32(a)(2), which states in material part:

". . . [T]he deposition of a party or of anyone who at the time of taking the deposition was an officer, director or managing agent . . . may be used (at the trial) by an adverse party for any purpose."

Ben Cooper is both an officer and a trustee of ART and clearly falls within the scope of this rule. Accordingly, his deposition may be used by the SEC under this rule as substantive evidence. *See, e. g., Proctor v. Colonial Refrigerated Transp. Co., Inc.,* 494 F.2d 89 (4 Cir. 1974); *Fey v. Walston & Co., Inc.,* 493 F.2d 1036 (7 Cir. 1974); *Community Counselling Service, Inc. v. Reilly,* 317 F.2d 239 (4 Cir. 1963); *Lassiter v. United States Lines, Inc.,* 370 F.Supp. 427 (E.D.Va.1973).

Even if the deposition is admissible under the Federal Rules of Civil Procedure, statements contained therein must be admissible under the Federal Rules of Evidence. Cooper's deposition constitutes an admission by a party opponent under Rule 801(d)(2)(C), Fed.R.Evid., and that rule provides that a "statement is not hearsay if— . . . [t]he statement is offered against a party, and is . . . a statement by a person authorized by him (in this case ART) to make a statement concerning the subject . . .." As an officer and trustee of ART, Cooper had implicit authority to speak on behalf of the Trust relating to matters within his knowledge and experience. Accordingly, the deposition is admissible under the Federal Rules of Evidence.

plaintiff is not entitled to the relief prayed for, and the action is therefore DISMISSED.